514 So.2d 727 (1987)
Lester JACKSON, Individually and as Administrator for the Minor Child Kerick Jackson and Bertha Jackson, Appellees,
v.
Dr. Ta Yu HUANG and Insurance Company of America, Appellants.
No. 19072-CA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1987.
Rehearing Denied November 25, 1987.
Writ Denied January 29, 1988.
Broussard, Bolton, Halcomb and Vizzier by Daniel E. Broussard, Jr., Alexandria, for appellees.
Theus, Grisham, Davis & Leigh by Ronald L. Davis, Monroe, Culpepper, Teat, Caldwell and Avery by Bobby L. Culpepper, Jonesboro, for appellants.
Before MARVIN, FRED W. JONES, Jr., and LINDSAY, JJ.
*728 FRED W. JONES, Jr., Judge.
The parents of a child injured at birth sued the attending physician and his malpractice insurer for damages. The jury deadlocked (6-6) and a mistrial was declared. By agreement the case was submitted on the record to another judge of the same judicial district, who rendered a judgment in favor of plaintiffs for a total of $467,324.
From this judgment the defendants appealed, contending the trial judge erred in:
1) Finding that Dr. Huang failed to possess or exercise the care and skill expected of him.
2) Finding that Dr. Huang failed to exercise reasonable care and diligence along with his best judgment in the treatment of his patients.
3) Assessing future lost income, future medical expenses and assessing excessive general damages.
4) Interpretation of the evidence and factual conclusion.
Mrs. Bertha Jackson is the mother of two children. The first was born in Shreveport in 1972, with no complications attending the delivery. Upon becoming pregnant a second time, in the summer of 1982, Mrs. Jackson consulted Dr. Huang of Jonesboro, who had been her physician since 1981.
Dr. Huang saw Mrs. Jackson in his office a number of times over the next several months and eventually fixed a delivery date of March 25, 1983. It was expected that the baby would weigh around nine pounds.
Experiencing labor pains, Mrs. Jackson went to the Jackson Parish Hospital during the early hours of April 1, 1983 and remained in the labor room from 4:00 A.M. until 8:30 A.M. Dr. Huang examined Mrs. Jackson at that time and instructed the nurses to take her to the delivery room. Dr. Huang gave his patient an epidural anesthesia and she was returned to the labor room. The doctor gave Mrs. Jackson additional epidurals at 10:47 A.M., 12:00 noon and at 1:20 P.M. Because of a slowdown in labor (attributed by Dr. Huang to the epidurals), at about 2:00 P.M. the physician ordered laboratory work for a Caesarian section if there was no progress in the active labor (anticipating about 30 minutes for the preparations).
Mrs. Jackson's labor then accelerated and she was taken to the delivery room at about 2:15 P.M. When Dr. Huang arrived in the delivery room the baby's head was crowning. With the assistance of low forceps, Dr. Huang delivered the baby's head. He then tried to deliver the anterior shoulder but was unable to do so. Confronted with this situation, Dr. Huang attempted to use the Woods screw maneuver. This was unsuccessful. He next pulled the posterior arm out, freed the posterior shoulder, and delivered the baby. The baby's right arm was flaccid following delivery. The child weighed 9 pounds, 10 ounces.
It was later determined that the baby (Kerick) sustained a permanent injury to the brachial plexus nerves of his right shoulder and arm while being delivered. This litigation ensued and trial was had in August 1985.
Dr. Forte, head of Family Practice at the LSU Medical School in Shreveport and board certified in OB/GYN, testified on behalf of the plaintiffs. This witness stated that he had delivered or supervised the delivery of several thousand babies over the years. He explained that shoulder dyscotia (which complicated this birth) occurs when the baby's shoulder hangs up under the pubic bone in the birth canal, arresting the progress of the child through the canal. It is important with shoulder dyscotia not to pull on the baby but only to guide it along the axis by rotating your hand. Upon encountering this emergency, the physician should first reach up and push down on the baby's shoulder to see if that will make it come loose. If this does not succeed, the second method is to push on the buttocks of the child to give some extra pressure. Where required, there are two other maneuvers, the Woods screw method or extracting the arm. As a last resort, Dr. Forte said he would break the baby's collar bone, allowing that shoulder to collapse and the baby to deliver.
*729 Dr. Forte explained that, if the attending physician is not expecting shoulder dyscotia and pulls too hard, the brachial nerve may be torn. It was his belief that Dr. Huang had failed to recognize shoulder dyscotia in this case until he had already pulled so hard that Kerick's nerve was injured. In other words, according to this witness Dr. Huang applied excessive traction on the baby's head before realizing that he was dealing with shoulder dyscotia, which he should have recognized beforehand and avoided the injury. Dr. Forte testified that factors frequently occurring in shoulder dyscotia are large size of baby (over 9 pounds) and a slowdown in the active phase of labor. In this case, in view of the normal delivery of the first child, the weight of this baby and the slowdown in active labor, Dr. Forte said Dr. Huang should have performed a timely Caesarian section, which would have avoided this injury.
Dr. Forte examined the delivery notes made by Dr. Huang and pronounced them very incomplete. He pointed out that this was an obstetrical emergency involving a serious complication and should have been described in some detail.
In conclusion, Dr. Forte expressed the opinion that Dr. Huang did not possess this knowledge and skill and in the failure to exercise reasonable care, Kerick's injury occurred.
Glenda Bond, registered nurse who attended Mrs. Jackson and assisted with this delivery, testified that Mrs. Jackson's labor was more lengthy than usual for a second delivery, but otherwise seemed normal. She said that the baby was delivered with "much traction." The doctor first tried to rotate the baby by using his fingers on the head and neck. Then he tried getting one arm out and pulling on it. The witness stated the doctor was surprised that, after the head delivered normally, the shoulders were stuck. The baby was flaccid at birth.
Dr. Huang, 46 years of age, testified he was a native of Taiwan, where he received most of his education. After graduating from medical school, which was accredited by the American Association of Medical Schools, he served one year as a medical officer in the Chinese Air Force and then moved to the Chicago area where he interned at a hospital in OB/GYN. After residencies in New Jersey and Ohio, Dr. Huang practiced three years in Minneapolis where he was a member of a group that specialized in OB/GYN. He relocated to Jonesboro some nine years ago. In connection with board certification, Dr. Huang said he had passed the written part of the examination but twice failed the oral portion. In 12 years of practice he had delivered about 2500 babies.
With reference to Mrs. Jackson's delivery, Dr. Huang explained that he did not make notes of the position of the baby as it progressed but kept that information in his head. He considered the progression of labor to be normal, slowed down a little by the epidurals. When the head presented itself the doctor said he was not aware there was going to be a problem with the delivery. Dr. Huang explained:
"I found out that the baby was in shoulder dyscotia right away when the head would not come out, so I tried to rotate the shoulder, using Dr. Wood's method, but it stopped. Then I pulled the posterior arm out to get the posterior shoulder out and then I tried to get the anterior shoulder out. Maybe injury occurred at that time, I don't know."
Dr. Huang pointed out that when shoulder dyscotia is encountered, the head has been delivered and it is then impossible to do a Caesarian section. On the other hand, the baby must be delivered within five minutes or it might either die or suffer brain damage. Dr. Huang admitted that a timely Casearian section would have avoided this injury, but felt that this was not mandated because of the resumption of normal labor. Furthermore, he explained that the mother or the baby might have suffered problems if a Casearian section had been performed.
In summary, the defendant testified he was confronted by an emergency which could not have been anticipated and immediately took reasonable, recognized medical *730 steps to resolve the difficulty and the injury was unavoidable.
Dr. Wayne Smith of Monroe, board certified in OB/GYN, testified on behalf of defendants. Dr. Smith completed his residency in 1976 and estimated he had delivered between 2500 and 3000 babies. He said that the medical records in this case were incomplete, not easy to interpret and difficult to use to put things together. However, it was his observation that most doctors do not write progress notes during labor. He did not think that a prudent obstetrician familiar with epidurals and the way they retard labor would have put this mother at the risk of a Caesarian section prior to the delivery. Therefore, Dr. Huang properly proceeded with the hope of a normal delivery. Based upon his study of the records in this case and his discussions with Dr. Huang, the witness said there were no indications which would have led him to expect a shoulder dyscotia. Once that situation is encountered, if the baby is not promptly delivered, it may either die or suffer brain damage. Dr. Smith could find no fault on the part of Dr. Huang.
Mrs. Jackson, 32 years of age, described the anxiety she suffered upon learning of Kerick's injury; visits to different physicians in connection with the disability; and the difficulty experienced by Kerick in attempting to use the severely impaired appendage. The child has no feeling in the lower part of his right arm, and is thus handicapped in engaging in many of the normal activities of youngsters his age.
In written reasons for ruling, the trial judge found that Dr. Huang "was aware of the extended labor and the large size of the baby" and should have been aware of the possible consequences, especially shoulder dyscotia. In summary, he held:
"It is beyond question that the injury was caused by Dr. Huang's response to the particular situation, i.e., the child's shoulder lodging against the mother's pubic bone, the doctor pulled on the baby with such force as to tear the brachial nerves. The Court finds Dr. Huang to have been negligent in that response; thus, it is the Court's conclusion that the plaintiffs have established:
1) The degree of care ordinarily practiced by physicians in this speciality;
2) That Dr. Huang failed to use reasonable care and diligence along with his best judgment in the application of that skill; and
3) That the injuries resulted as a consequence."
Liability
In a medical malpractice action, the plaintiff has the burden of proving the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians within the involved medical specialty; that the defendant either lacked this degree of knowledge or skill, or failed to use reasonable care and diligence along with his best judgment in the application of that skill; and that as a result injuries were sustained that would not have otherwise occurred. La.R.S. 9:2794.
A general physician is not required to exercise the highest degree of care possible. His duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. The law does not require absolute precision in medical diagnoses. Acts of professional judgment are evaluated in terms of reasonableness under the circumstances then existing, not in terms of result or in the light of subsequent events. Matthews v. LSU Medical Center, 467 So.2d 1238 (La.App. 2d Cir.1985).
As to our standard of review where the trial judge did not preside over the trial and observe the witnesses, the state supreme court in Virgil v. American Guarantee & Liability Ins., 507 So.2d 825 (La.1987) stated:
"... the reviewing court must give great weight to factual conclusions of the trier-of-fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason *731 for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
The court system utilized by Louisiana allocates the fact-finding function to the trial courts and great deference is accorded in that court's factual findings, Virgil, supra. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appellate review of the trial court's judgment. In following this holding of the Louisiana Supreme Court, this court must review this case under the manifest error standard traditionally followed in appellate review.
In his assessment of witness credibility, the trial judge accepted the testimony of Dr. Forte that Dr. Huang did not possess the degree of knowledge and skill usually possessed by physicians practicing OB/GYN in the relevant area, and defendant's failure to exercise reasonable care led to Kerick's injury. It was noted that, because of the prolonged labor and the weight of the baby, Dr. Huang should have anticipated the possibility of shoulder dyscotia and performed a timely Caesarian section. We cannot say the trial judge was clearly wrong in this finding.
Damages
In written reasons for ruling, the trial judge awarded to Lester Jackson, as administrator of the estate of Kerick, the following damages:

 Loss of earnings $183,445
 Loss of earning capacity 100,000
 General damages for disfigurement,
 etc. 150,000
 Future medical expenses 8,266

Mrs. Jackson was awarded $25,000 for her mental anguish.
We find no abuse in the trial court's award of the general damages to the Jacksons nor in the award for future medical expenses.
However, the trial judge did err in this case in making awards for both loss of future earnings and loss of earning capacity.
The proof necessary to support a claim for lost future income is clearly outlined by this Court in Morgan v. Willis Knighton Medical Center, 456 So.2d 650, 658 (La.App. 2d Cir.1984):
"A number of factors must be analyzed in determining loss of future income, including the plaintiff's physical condition before and after his injury; his past work record and the consistency thereof; the amount plaintiff probably would have earned absent the injury complained of; and the probability he would continue to earn wages over the balance of his working life.
In computing loss of future income, it is first necessary to determine whether and for how long a plaintiff's disability will prevent him from engaging in work of the same or similar kind to that he was doing at the time of the injury; it is necessary to ascertain whether he has been disabled from work for which he is fitted by training and experience."
Since Kerick had no employment record upon which a loss of future income could be calculated, the trial court erred in making an award for this item.
As to the award for loss of earning capacity, we pointed out in Hill v. Sills, 404 So.2d 1323 (La.App. 2d Cir.1981):
It is now an established legal proposition in this state that a successful claimant is not only entitled to recover for his actual wage or income loss, but also for the effect of his disability on his capacity to earn. Even if unemployed at the time of injury, he may be entitled to an award for impairment of earning power. Such damages are calculated on the injured person's ability to earn money rather than on what he actually earned before the injury. The rationale underlying this jurisprudential rule is that the injury inflicted may have deprived the claimant of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
The trial judge pointed out in his reasons for his ruling:

*732 "Dr. Duggar's estimate of lost earnings was $132,770, and presupposed that he would be gainfully employed during his entire 40-year work-life. He further testified that the loss would be $386,144, absent any work history whatever. Considering the nature of the disability involved, the type of work to which Kerick will be limited during his lifetime, the vicissitudes of a labor economy, etc., no one can predict so concretely that Kerick will be fully employed during the entire period of his work-life. This Court has arbitrarily attempted to take that contingency into effect by assuming that one-fifth of his work-life will be unemployed."
Rather than making an award of loss of future earnings on this basis, the trial judge should have used it to make an award for loss of earning capacity, which we fix at $175,000 rather than $100,000.
In summary we delete the figure of $183,445 for loss of future earnings and increase the figure for loss of earning capacity from $100,000 to $175,000.
Decree
For the reasons set forth, the second paragraph of the judgment appealed is amended to read as follows:
"IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Lester Jackson, as Administrator of the Estate of his minor child, Kerick Jackson, and against the defendants, Dr. Ta Yu Huang and Insurance Corporation of America, in solido, in the full sum of $333,266, together with legal interest thereon from date of judicial demand until paid;"
and, as amended, said judgment is affirmed, at appellants' cost.

ON APPLICATION FOR REHEARING
Before JASPER E. JONES, FRED W. JONES, Jr., LINDSAY, MARVIN and SEXTON, JJ.
Rehearing denied.