556 So.2d 276 (1990)
Paul SOTEROPULOS
v.
Dr. Frank SCHMIDT and Dr. Robert Hewitt.
No. 89-CA-0436.
Court of Appeal of Louisiana, Fourth Circuit.
January 30, 1990.
Rehearing Denied February 21, 1990.
*277 Lawrence L. McNamara, Gregory C. Weiss, Adams & Reese, New Orleans, for appellants-defendants.
James L. Bates, Jr., New Orleans, for appellee-plaintiff.
Before BARRY, BYRNES and PLOTKIN, JJ.
BYRNES, Judge.
In this medical malpractice litigation, the defendants, Dr. Frank Schmidt and Dr. Robert Hewitt, appeal a jury award of $60,294.00 to plaintiff Paul Soteropulos. We affirm.
In 1978, plaintiff, Paul Soteropulos, first sought medical consultation with cardiovascular and vascular surgeons, Drs. Schmidt and Hewitt, because of chest pains due to blockage in his coronary arteries. Examination and testing revealed that the patient had diabetes mellitus, complicated by circulatory deficiencies, including increased levels of arteriosclerosis. His medical history indicated that he suffered a heart attack in 1954, became insulin dependent in 1966 and underwent surgery in 1969 because of an occluded vessel in his heart.
In 1980 the patient again consulted the defendants after experiencing temporary paralysis or transient ischemic attacks on the right side of his body causing intermittent dizziness. Drs. Schmidt and Hewitt successfully performed a carotid endarterectomy and removed the stenosis (or constriction) in the affected artery.
In August, 1983, the plaintiff was examined by Dr. Joseph P. Licciardi, Jr., an orthopedic surgeon, who found an ulcerated area on Soteropulos's right heel caused by poor circulation in his right foot. Dr. Licciardi referred the patient to Drs. Schmidt and Hewitt, who performed a vein bypass graft procedure on September 7, 1983, to restore blood flow to the lower leg and allow the wound to heal. Over the next few weeks, another ulcer appeared on the right lower heel. Soteropulos was readmitted to Southern Baptist Hospital on October 31, 1983 upon determination that the vein graft bypass failed to supply sufficient blood circulation to the lower leg. On November 8, 1983, Drs. Schmidt and Hewitt performed a right below-knee amputation, employing the circumferential or guillotine technique.
After discharge, on November 24, 1983, the patient fell in his home, striking the bottom of his stump, and causing a one inch opening in the incision. Soteropulos complained of pain in his right knee joint to his physical therapist, Michael Lynn Caldwell, who discontinued his exercises until he saw his physician. On December 23, 1983, Dr. Schmidt referred the plaintiff to Dr. Licciardi because of Soteropulos' complaints focused on his right knee joint. The break in the incision had healed when Dr. Licciardi initially examined it.
Soteropulos testified in March, 1984, he was initially fitted for a temporary prosthesis at the Veterans Administration. Soteropulos testified that he only walked a couple of steps with the prosthesis when he felt severe pain and a tissue breakdown occurred. Dr. Kenneth Veca performed revision surgery on the stump on April 23, 1984, in which he bevelled the tibia, removing one-half centimeter of the bone as well as a neuroma or swelling of scar tissue surrounding the nerve. Thereafter, Dr. Veca continued to treat Soteropulos for a bone spur, an ulcer and tissue break-downs *278 with a wound at the bevelled site. In September, 1984, Dr. Veca felt the patient was ready for a prosthesis.
Subsequently, Soteropulos filed a medical malpractice suit, claiming that Drs. Schmidt and Hewitt were negligent in (1) the quality of care received after the vein bypass operation, and (2) the quality of the original amputation surgery. At the close of plaintiff's case, the trial court granted a directed verdict on the issue of the post-operative care following the vein bypass surgery. Thereafter, the jury returned with a verdict awarding the amount asked for by the plaintiff in respect to the original amputation surgery.
On appeal, Drs. Schmidt and Hewitt claim the trial court erred in failing to grant a directed verdict or judgment notwithstanding the verdict on the grounds (1) that no medical expert testimony established the standard of care applicable to vascular surgeons; and (2) there was no evidentiary basis to support the jury verdict that there was a breach of that standard of care. The defendants claim that plaintiff's witnesses, including orthopedic surgeons, are not competent to testify as to the standard of care applicable to vascular surgeons in the performance of amputations under R.S. 9:2794. Therefore, there was insufficient evidence showing a breach of the defendant's standard of care. Plaintiff counters that where there is an overlapping in specialties, the witnesses' testimony is relevant to show the standard of care that the defendants breached.
In a medical malpractice action, the plaintiff has the burden of proving (1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians within the involved medical specialty; (2) that the defendants either lacked this degree of knowledge or skill or failed to use reasonable care and diligence along with their best judgment in the application of that skill; and (3) that as a result injuries were sustained that would not have otherwise occurred. La.R.S. 9:2794. Jackson v. Huang, 514 So.2d 727 (La.App. 2d Cir. 1987); writ denied, Jackson v. Tayu Huang, 518 So.2d 1050 (La.1988) and writ denied, Jackson v. Huang, 519 So.2d 119 (La.1988).
A physician's duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. The law does not require absolute precision in medical diagnoses. Acts of professional judgment are evaluated in terms of reasonableness under the circumstances then existing, not in terms of the result or in light of subsequent events. Jackson v. Huang, supra; Delaneuville v. Bullard, 361 So.2d 918 (La.App. 4th Cir.); writ denied, 363 So.2d 1385 (La.1978).
Where the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only those qualified in that specialty may offer evidence of the applicable standards. La.R.S. 9:2794(A)(1). Steinbach v. Barfield, 428 So.2d 915 (La. App. 1st Cir.); writ denied, 435 So.2d 431 (La.1983). However, it is a specialist's knowledge of the requisite subject matter, rather than the specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised; a particular specialist's knowledge of the subject matter on which he is to offer expert testimony is determined on a case by case basis. McLean v. Hunter, 495 So.2d 1298 (La. 1986). The opinions of a specialist as to matters within his field are entitled to greater weight than an opinion on the same subject by a specialist in another field. Faust v. Lombardo, 463 So.2d 745 (La.App. 4th Cir.), writ denied, 464 So.2d 1380 (La. 1985).
The defendants assert that none of the witnesses who testified for the plaintiff were qualified vascular surgeons familiar with the guillotine technique used by Drs. Schmidt and Hewitt. They note that Dr. James Tubb was a cardiovascular surgeon but had discontinued performing amputations in 1975 and referred patients to orthopedic surgeons. They argue that Dr. Tubb was not questioned about the amputation performed on plaintiff or the appropriate standard of care for the amputation.
*279 The physicians at trial testified that there is an overlap among the medical fields of vascular, orthopedic and general surgery with regard to below-knee amputations. However, the defendants assert that the orthopedic surgeons were not experienced in performing amputations using the guillotine technique. Dr. Schmidt testified that he did not use the Campbell Burgess or fish mouth flap technique commonly performed by orthopedic surgeons because the lower end of the flaps of skin gets its blood supply only from the base of the flap. Therefore, the lower end of the flap would be in danger of not having enough circulation and there was a strong likelihood of losing the end of a flap with greater risk of infection leading to an above-knee amputation.
Dr. Eugene J. Dabezies, an orthopedic surgeon testifying on behalf of the plaintiff, asserted that he was familiar with below-knee amputations common with poor circulation or peripheral vascular disease. He ordinarily preferred the long posterial flap method for vascular patients but would use the guillotine method in traumatic cases. Regardless of flaps or not, Dr. Dabezies confirmed that the tibia should be rounded and the edges made smooth to have no "hot spots" or sharp edges. Under either technique, Dr. Dabezies stated that, "the standard should be the same. At time of closure, there should be no hot spots and if this requires rasping and bevelling, that is what should be done." This applies to cardiovascular, orthopedic and general surgeons, i.e. "any surgeon that takes this as the obligation to complete an amputation to heal."
Dr. Kenneth Veca who testified on behalf of the plaintiff, was an orthopedic surgeon. He asserted that most of his amputations were performed on patients with vascular disease. Dr. Veca was familiar with the guillotine technique of amputation. He found that patients with vascular problems were prone to tissue breakdown. In his revision surgical report, Dr. Veca noted that he had observed an "oblique type of osteotomy [or bone cutting on the transverse portion, horizontally] without bevelling." He removed a neuroma and finding "sharp edges on the anterior prominence of the tibia," he made an angle on the front and below points of the tibia to eliminate the pressure and rasped the edges. Although Dr. Veca agreed that the primary goals in amputations of vascular patients are to keep the patient alive and to achieve a below-knee amputation, Dr. Veca stated that it was routine to remove the pressure points or sharp edges in a tibial osteotomy.
Monty Young, a certified prosthesist, testified on plaintiff's behalf. Although he never recalled seeing a new amputee with a guillotine cut, he noted that it was very common for him to manufacture prosthetics for patients who had lost limbs due to peripheral vascular disease. When he looked at the plaintiff's stump, Mr. Young saw a bony protuberance which he thought was very sharp with very thin skin covering it. He stated that he would take the bony protuberance into account in fitting a prosthesis but nevertheless, there would be pressure in sliding the leg into and out of the socket which would cause a breakdown of tissue.
Dr. Robert Craig Batson, a vascular surgeon, testified for the defendants. He was on the medical review panel consisting of three vascular surgeons who concluded that the evidence did not support that the defendants failed to meet applicable medical standards of care charged in the complaint. In reviewing the records and x-rays, Dr. Batson found no sharp edges on the tibia and opined that revision surgery after the amputation did not indicate surgical error. Additionally, the changes after surgery were very minor.
On behalf of the defendants, Dr. Raoul P. Rodriquez, orthopedic surgeon, testified that the guillotine method was a quick life-saving procedure. He stated that there is a high degree of revision surgery regardless of the technique. Dr. Rodriquez asserted that in a below-knee amputation, it would be wrong to round the edges because more damage might be done to the tissue by cutting off more bone.
*280 Defendant, Dr. Schmidt, testified that the plaintiff was a poor surgical risk. He asserted that in performing the amputation, he bevelled the bone so there would be no pressure points that would interfere with wearing an artificial leg. He stated that the amount of bevelling was a matter of the surgeon's judgment in conforming to the patient's body contour. His goals in performing the operation on a patient with vascular disease were: (1) remove the diseased leg; (2) if possible provide a below-knee stump; (3) minimize trauma by performing the procedure as soon as possible; and (4) provide the best stump he could. He asserted that he did not leave any sharp edges, but the fact that sharp edges may be present did not indicate a deviation below the standards of care of vascular surgeons.
Defendant's witness Dr. Joseph Licciardi, an orthopedic surgeon with special training in amputation surgery and prosthetics, had examined the plaintiff after his original amputation. Dr. Licciardi found no evidence of sharp edges of the tibia bone sticking out through the stump. He opined that bevelling seemed appropriate and did not notice any pressure on the skin in front of the tibia. Dr. Licciardi stated that a breakdown of a wound after amputation surgery was a common cause for revision surgery in diabetics with arteriosclerosis. In comparing post-operative x-rays after the amputation and Dr. Veca's revision, he saw that Dr. Veca had rounded the bone a little more.
Defendant, Dr. Robert Ernest Hewitt, assisted Dr. Schmidt in the November 8, 1983 amputation. He testified that the tibia was bevelled with no sharp edges and was performed in accordance with his specialty of vascular surgery.
Based on the trial testimony of the physicians for the plaintiff and the defendants, we conclude that the standard of care is the same for orthopedic and vascular surgeons with respect to bevelling or smoothing the edges of the tibia in performing a below-knee amputation on a patient with vascular disease. The orthopedic surgeons were qualified to give their expert opinions in that regard. Both parties provided contradictory evidence as to whether the defendants conformed to that standard of care. The jury as trier of fact is obliged to weigh and evaluate the testimony of the medical experts to determine whether there was a breach of the standard of care.
The reviewing court must give great weight to factual conclusions of the trier-of-fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are reasonable. Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987); Jackson v. Huang, supra, 514 So.2d at 730. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. Esco, 549 So.2d 840 (La. 1989). Evidence was presented upon which the jury could conclude that Drs. Schmidt and Hewitt performed below the standard of care within their medical specialty in failing to bevel the edges of the plaintiff's tibia which caused the injury to Soteropulos' stump resulting in his inability to wear a prosthesis. We cannot find that the jury was clearly wrong in concluding that the defendants breached their standard of care in performing the plaintiff's amputation. Based on the evidence presented, we conclude that the trial judge did not abuse her discretion in denying defendants' motion for a directed verdict or a judgment notwithstanding the verdict.
For the foregoing reasons, the judgment is affirmed with defendants to bear costs of appeal.
AFFIRMED.