STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

08-119


BEVERLY HOBBS, ET AL.

VERSUS

PATRICK SAVOY, M.D., ET AL.


**********
APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. C-2004-495
HONORABLE JOHN P. NAVARRE, AD HOC
**********

**GLENN B. GREMILLION**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, Glenn B. Gremillion, and James T. Genovese, Judges.

**AFFIRMED.**


**Joseph T. Dalrymple**
**Rivers, Beck, Dalrymple & Ledet**
**P. O. Drawer 12850**
**Alexandria, LA 71315-2850**
**(318) 445-6581**
**Counsel for Plaintiffs/Appellees:**
    **Beverly Hobbs**
    **Cecil Hobbs**

**James R. Shelton**
**Tiffany C. Babineaux**
**Durio, McGoffin, Stagg, & Ackermann, P.C.**
**P. O. Box 51308**
**Lafayette, LA 70505-1308**
**(337) 233-0300**
**Counsel for Defendants/Appellants:**
  **St. Paul Fire & Marine Ins. Co.**
  **Patrick Savoy, M.D.**

GREMILLION, Judge.

The defendants, Dr. Patrick Savoy and his insurer, St Paul Fire & Marine Insurance Co., appeals the trial court's ruling allowing a physician specializing in internal medicine to testify during a medical malpractice trial against him, when the defendant's specialty is general surgery. We affirm.

## FACTS

The plaintiffs, Beverly and Cecil Hobbs, filed a medical malpractice suit against Dr. Savoy and St. Paul, after two of Beverly's toes were amputated from her right foot. Beverly, who was obese, suffered from diabetes, and smoked, was initially treated by Dr. Dib Caeb, an internist, for pain and discoloration in the first three toes on her right foot. She was admitted to the Oakdale Community Hospital on April 29, 2002. Dr. Caeb, after consulting with Dr. Savoy, commenced treating Beverly with Heparin, an anti-coagulant. On April 30, 2002, Dr. Caeb noted that she had less pain in her right foot and was feeling better. As he was to be out of the country for the next seven days, he turned Beverly's care over to Dr. Savoy.

On April 30, 2002, Dr. Savoy noted that Beverly complained of pain in her right great and third toes and that those areas were starting to demarcate. He increased the Heparin and, on May 1, 2002, her foot looked better although there was still some discoloration in the subject toes. Dr. Savoy planned to continue the anti-coagulation therapy and await events. On May 2, 2002, Beverly's sister-in-law told Dr. Savoy that Beverly had suffered from abdominal problems for ten years. When questioned, she affirmed that she suffered from such pains after eating heavy or fatty meals. Dr. Savoy noted that she was tender in the right upper quadrant of her

1

abdomen and ordered an ultrasound of her gall bladder. That test revealed gall stones and a thickened gall bladder wall. The decision was made to remove Beverly's gall bladder prior to putting her on Coumadin, an anti-coagulant. The Heparain was stopped at 2:00 a.m. on May 3, 2002. A laparoscopic cholecystectomy was performed later that day. On May 4, 2002, the date she was released from the hospital, the nurse's notes indicate that Beverly's right toes remained cyanotic and painful. In addition to pain medication, she was placed on Ecotrin (aspirin) daily, which is an anti-platelet treatment.

Beverly returned to the emergency room later that day due to a mix-up with her pain medication. She was given a shot for pain, but refused to see the emergency room physician. She returned to the emergency room two days later on May 6, 2002, due to severe pain in her right foot. Her right great toe was purplish in color with decreased feeling and felt cold to the touch. She was diagnosed with peripheral vascular disease and was admitted to the hospital by Dr. Savoy. On May 8, 2002, Dr. Savoy amputated the first and third toes on her right foot which had become gangrenous. She was discharged from the hospital on May 11, 2002.

Beverly was readmitted to the hospital on May 31, 2002, after complaining of pain in the first three toes of her left foot. She was admitted by Dr. Caed, with a diagnosis of left lower extremity small vessel arterial thrombosis. While in the hospital, it was discovered that her homocysteine level was 20.9, which was twice the normal range of 4.0 to 10.0. To counter this, Dr. Caed started Beverly on Folic Acid and vitamin B-12. Consequently, the condition of her toes improved and she was discharged home on June 4, 2002.

2

The Hobbses instituted a medical malpractice claim against Dr. Savoy, after which a medical review panel found that the evidence failed to show that Dr. Savoy breached the applicable standard of care in his treatment of Beverly. Thereafter, the Hobbses filed the instant medical malpractice action against Dr. Savoy and his insurer. The matter proceeded to a trial on the merits. At the conclusion of the trial, the trial court took the matter under advisement. It then rendered an opinion finding that Dr. Savoy had breached the applicable standard of care in treating Beverly. As liability had been determined, the parties then submitted post-trial briefs on the issue of quantum. The trial court then rendered a judgment awarding Beverly $50,000 in general damages and Cecil $15,000 for loss of consortium. A judgment was rendered in this matter on October 12, 2007. This appeal by Dr. Savoy followed.

## ISSUE

On appeal, Dr. Savoy raises only one assignment of error. He argues that the trial court committed legal error by allowing Dr. Caed, an internist, to qualify as an expert regarding the standard of care to be attributed to a general surgeon such as himself.

## STANDARD OF CARE

Dr. Savoy raises the question of whether Dr. Caed, an internist, should be allowed to offer opinions regarding the standard of care applying to general surgeons. In this instance, we agree with the trial court that the answer is yes.

Louisiana Revised Statutes 9:2794(A) provides the burden of proof applying in medical malpractice matters:

> In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq. . . . the plaintiff shall have the

3

burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; **and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.**

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

(Emphasis added).

In *Turner v. Massiah*, 94-29, p. 10 (La. 5 Cir. 7/1/94), 641 So.2d 610, 617, *aff'd in part and rev'd in part on other grounds*, 94-2548 (La. 6/16/95), 656 So.2d 636, the fifth circuit stated:

Generally, where the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only those qualified in that specialty may offer evidence of the applicable standards. La.R.S. 2794(A)(1). However, it is a specialist's knowledge of the requisite subject matter, rather than the specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised; a particular specialist's knowledge of the subject matter on which he is to offer expert testimony is determined on a case by case basis. *McLean v. Hunter*, 495 So.2d 1298 (La.1986); *Soteropulos v. Schmidt*, 556 So.2d 276 (La.App. 4th Cir.1990).

In this instance, it is not the surgical procedure performed by Dr. Savoy which is called into question. Rather, it is his treatment of Beverly's peripheral vascular disease, which eventually led to the amputation of two toes on her right foot.

4

The trial court found that the treatment of an occlusion with anti-coagulant medications was an internal medicine issue, rather than a surgical issue. Dr. Caeb, board certified in internal medicine, stated that he had no problem with Dr. Savoy performing the cholecystectomy. However, he opined that the standard of care applicable in this instance required Dr. Savoy to delay performing surgery to correct a ten-year-old chronic problem so that he could continue the beneficial anti-coagulant treatment until the threatened limb was stabilized. Moreover, Dr. Keith Colomb, a general surgeon who participated in the medical review panel and testified on behalf of Dr. Savoy, testified that the treatment of Homocystinuria fell more within the specialty of internal medicine rather than general surgery.

Based on the foregoing, we find that the alleged negligent acts of Dr. Savoy do not raise an issue peculiar to the medical specialty of general surgery. As the trial court found, those acts fall more within the specialty of internal medicine. Accordingly, we find that the trial court did not commit legal error in allowing Dr. Caeb to testify in this matter.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to the defendants-appellants, Dr. Patrick Savoy and St. Paul.

**AFFIRMED.**

5