DISCUSSION
Standard of care and breaches thereof
The Louisiana Medical Malpractice Act defines "malpractice," in pertinent part, as:
... any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient ....
*63 La. R.S. 40:1231.1 A(13). The burden of proof in a medical malpractice case rests with a claimant who must prove by a preponderance of the evidence the three elements set forth in La. R.S. 9:2794 A:
First, the plaintiff must establish "[t]he degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances." La. R.S. 9:2794 A(1). Notably, "where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty." Id. Second, the plaintiff must establish that "the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill." La. R.S. 9:2794 A(2). Lastly, the plaintiff must prove that "as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred." La. R.S. 9:2794 A(3).
Minor v. Bryan , 16-0323, pp. 8-9 (La. App. 4 Cir. 12/15/16), 206 So.3d 1070, 1076, writ denied , 17-0336 (La. 4/7/17), 218 So.3d 115. We summarized this burden of proof as follows: "A medical malpractice plaintiff, therefore, 'must establish the standard of care applicable to the charged physician , a violation by the physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom.' " Id. , 16-0323, p. 9, 206 So.3d at 1076, quoting Pfiffner v. Correa , 94-0924, p. 8 (La. 10/17/94), 643 So.2d 1228, 1233 (emphasis in the original). See also , Samaha v. Rau , 07-1726, pp. 5-6 (La. 2/26/08), 977 So.2d 880, 884.
As a general rule, expert testimony is required "to establish the applicable standard of care and whether or not that standard was breached, except where the negligence is so obvious that a lay person can infer negligence without the guidance of expert testimony." Schultz v. Guoth , 10-0343, p. 7 (La. 1/19/11), 57 So.3d 1002, 1007 ; See also , Samaha , 07-1726, pp. 5-6, 977 So.2d at 884, citing Pfiffner v. Correa , 1994-0924, 1994-0963, 1994-0992 (La.10/17/94), 643 So.2d 1228.[2] In most cases, though, "because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794's requirements without medical experts ...." Battaglia v. Chalmette Med. Ctr., Inc ., 12-0339, p. 4 (La. App. 4 Cir. 10/17/12), 126 So.3d 524, 526, quoting Pfiffner , 94-0924, p. 9, 643 So.2d at 1234.
In this matter, the plaintiff contends that the expert retained on her behalf, Dr. Leo Frangipane, Jr., a board certified general *64 surgeon,[3] established the standard of care applicable to all of the defendants in this case and a breach by the defendants of that standard of care. The defendants, however, maintain that, as a general surgeon, Dr. Frangipane is not qualified to render an opinion as to the standards of care of any the defendants, insofar as he has never trained for or practiced in any of their respective fields. Over the objection of the defendants, the trial court accepted Dr. Frangipane as an expert in the field of general surgery and medicine. As noted, in their answers to the appeal, the defendants contend that the trial court erred in accepting Dr. Frangipane as an expert and allowing him to testify as to the standard of care of their specialties (Dr. Todd, as an orthopedic surgeon; Drs. Hawawini, Ulfers and Jones, as specialists in hospital medicine; Mr. Thibodeaux, as a nurse practitioner; and both Dr. Hawawini and Mr. Thibodeaux, in their capacity as health care providers in a rehabilitation hospital).
The Louisiana Supreme Court has indicated that, in a medical malpractice action, a "district court is accorded broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert." Johnson v. Morehouse Gen. Hosp. , 10-0387, p. 17 (La. 5/10/11), 63 So.3d 87, 99. We have thoroughly reviewed the record before us, and although Dr. Frangipane, as a general surgeon, clearly does not practice in the precise medical fields of the various defendants, he nevertheless was qualified to testify in this case. We thus find no error in the trial court's discretion in qualifying Dr. Frangipane as an expert in this matter and allowing him to testify about the standard of care and breaches thereof. However, we find that the trial court erred in granting directed verdicts in favor of the defendants (with the exception of Dr. Hawawini). As is our task and responsibility on appeal, we have reviewed the evidence submitted, and in particular, the testimony of Dr. Frangipane, and we do not find "that reasonable persons could not have reached a verdict in favor of the plaintiff."
It is well-settled that "[w]here the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only physicians in that specialty may offer evidence of the applicable standard of care." Broussard v. Andersson , 05-0006, pp. 6-7 (La. App. 4 Cir. 11/30/05), 921 So.2d 128, 132, citing McDaniel v. Reed , 00-2529, p. 3 (La. App. 4 Cir. 10/3/01), 798 So.2d 1121, 1123. Furthermore, this Court has indicated that:
... [I]t is a specialist's knowledge of the requisite subject matter, rather than the specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised. A particular specialist's knowledge of the subject matter on which he is to offer testimony is determined on a case by case basis.
Howard v. Vincent , 11-0912, p. 6 (La. App. 4 Cir. 3/28/12), 88 So.3d 1219, 1222. See also McDaniel , 00-2529, p. 3, 798 So.2d at 1123. Moreover, "where medical disciplines overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines." Pertuit v. Jefferson Par. Hosp. Serv. Dist. No. 2 , 14-752 (La. App. 5 Cir. 5/14/15), 170 So.3d 1106, 1110, writ denied , 15-1176 (La. 9/18/15), 178 So.3d 152.
*65 Our jurisprudence further indicates that "[g]enerally, the fact that a medical doctor is not a specialist in a particular field applies only to the effect on the weight to be given such testimony, not to its admissibility." Hubbard v. State , 02-1654, pp. 14-15 (La. App. 4 Cir. 8/13/03), 852 So.2d 1097, 1104-05, quoting Hunter v. Bossier Medical Center , 31,026, p. 14 (La. App. 2 Cir. 9/25/98), 718 So.2d 636, 644. See also , McDaniel , 00-2529, pp. 5-6, 798 So.2d at 1124 ; Marshall v. Boydston , 09-1137, p. 5 (La. App. 3 Cir. 3/17/10), 33 So.3d 438, 443.
Case law clearly allows for physicians to testify in fields other than their own, when there is sufficient knowledge of the requisite subject matter. In Soteropulos v. Schmidt , 556 So.2d 276 (La. App. 4 Cir.1990), for example, the plaintiff underwent a below-knee amputation, performed by two cardiovascular and vascular surgeons. An orthopedic surgeon was permitted to give expert opinion regarding the standard of care of the vascular surgeon. Indeed, the orthopedic surgeon testified:
... "the standard should be the same. At time of closure, there should be no hot spots and if this requires rasping and bevelling, that is what should be done." This applies to cardiovascular, orthopedic and general surgeons, i.e. "any surgeon that takes this as the obligation to complete an amputation to heal."
Id. , 556 So.2d at 279.
Similarly, in Smith v. Juneau , 95-0724 (La. App. 4 Cir. 4/9/97), 692 So.2d 1365, 1371, the plaintiff was severely injured in a single car accident. After several surgeries, a ten day stay in intensive care and transfer to another hospital, it was discovered that the plaintiff had a significant bedsore, for which he underwent numerous surgeries and was left disfigured. In his suit against his treating physicians, and in response to a writ application, the Louisiana Supreme Court indicated that a physician who practiced in the area of physical medicine and rehabilitation was to be allowed to testify in a trial. Smith v. Juneau , 94-2440 (La. 9/29/94), 642 So.2d 860. At trial, he testified as to the standard of care of the orthopedic surgeon and indicated that he "did not use reasonable diligence in caring for plaintiff's skin while plaintiff was hospitalized ...." and further testified that the orthopedic surgeon "should have ordered plaintiff's skin checked daily and if plaintiff was lying in bed, he should have issued orders to turn the patient every two hours from the time he came out of surgery ... until his discharge." Smith , 692 So.2d at 1371. Importantly, the Court found:
Considering that the record adequately supports a finding that the issue of skin care is not peculiar to any one specialty, any qualified physician could testify concerning the standard of care to be exercised by an orthopedic surgeon caring for a patient. Further, Dr. McCready did not testify concerning the standard of care in an area peculiar to the specialty of orthopedic surgeons, but only the standard of care as to skin care. Consequently, the trial court did not err in allowing Dr. McCready's testimony on this issue.
Smith , 95-0724, pp. 15-16, 692 So.2d at 1373. See also , Slavich v. Knox , 99-1540 (La. App. 4 Cir. 12/15/99), 750 So.2d 301, 304 (no error found in allowing a general surgeon to testify as to the standard of care of an internist, citing Pfiffner v. Correa , 643 So.2d 1228 (La.1994), for the principle that "there is no requirement that a physician have the same specialty as defendant physician in cases where the medical and fact issues are such that a jury can perceive negligence in the physician's conduct.");
*66 Kieffer v. Plunkett-Kuspa , 13-499, p. 7 (La. App. 5 Cir. 3/26/14), 138 So.3d 682, 685 (no error found in allowing a board certified neurologist to testify as to the standard of care of a primary care physician, testifying: "I don't think the standard of care for primary care physicians are any different than anybody else when faced with an illness of this type with the potential implications .... [T]he internist should have taken further action such as a lumbar puncture or admit her to the hospital for evaluation.").
In the instant matter, Dr. Frangipane testified that, as a general and vascular physician, his practice encompasses the diagnosis and treatment of DVT. He indicated that "[a]ny general surgeon that [sic] is very active will run across that from time to time." When questioned as to whether "the risk that DVT can result in a pulmonary embolism and a patient's death, is ... something that's recognized in the field of medicine," Dr. Frangipane testified that it is "[v]ery well recognized."
In Dr. Frangipane's opinion, Mr. Smallwood died as a result of medical malpractice; he stated that Mr. Smallwood was at an elevated risk of developing DVT and the defendants, collectively, failed to "accurately diagnose the ongoing [DVT]," failed to perform certain tests to determine whether Mr. Smallwood was experiencing DVT and thus, their actions "fell below the standard of care that should have been or that was in place."
Dr. Frangipane reviewed guidelines from various publications which set forth risk factors for DVT, but acknowledged that there is "not really" any guideline "that is specific to the particular surgical procedure that Mr. Smallwood underwent." He also acknowledged that prophylactic measures were taken for Mr. Smallwood's post-operative care, designed to reduce the risk of his developing DVT. Those include the use of a TED stocking after surgery, SCD's (sequential compression devices, which Dr. Frangipane testified are "a kind of stocking that gently milks the leg back in which the venous circulation returns guided by the SCD ... back to the heart"), and the use of aspirin. However, Dr. Frangipane opined that the defendants failed to take further appropriate measures to avoid DVT. According to Dr. Frangipane, these measures were not sufficient. To the contrary, Dr. Frangipane testified that Mr. Smallwood had an increasing risk of developing a post-surgical DVT, but he did not receive pharmacologic prophylaxis, such as blood thinners. According to Dr. Frangipane, "the risks of giving prophylaxis are far less than the risks of not giving prophylaxis."
Similar to the testimony of the physicians at issue in Soteropulos , Smith , and Kieffer , according to Dr. Frangipane, the standard of care with respect to the diagnosis and treatment of DVT is the same for all specialties; he testified as follows:
Q. With respect to post-surgical treatment of a patient regarding DVT prophylaxis and detention, is there any difference in standard of care whether you're a surgeon or hospitalist or a medical director?
A. The difference is the same for all of us. We look at DVT, or should anyway, the same way. We're all trying to create prevention.
According to Dr. Frangipane, the failure of the defendants, individually and collectively, to undertake the additional measure of administering pharmacologic prophylaxis to Mr. Smallwood equated to breaches of the standards of care for each of the defendants.
Dr. Frangipane's criticism of Dr. Hawawini, however, was imprecise and he did not indicate that Dr. Hawawini had any direct involvement in Mr. Smallwood's *67 care, nor that, as a medical director, he should have been involved in the care of individual patients. To the contrary, Dr. Frangipane simply testified as follows:
I suspect that even though I am not a medical director, one of the things that I have seen in patients in whom I have given the care over to a physician such as this while they're recovering from surgery, every one [sic] should know the treatment and the ability to care for patients at higher risk for DVT. (emphasis added).
Because the record is void of any evidence regarding the standard of care of a director of skilled nursing unit and void of any testimony regarding a breach on Dr. Hawawini's part, we find that the trial court correctly granted a directed verdict in favor of Dr. Hawawini and we affirm that portion of the judgment.[4]
Having determined that the trial court erred in granting, in part, directed verdicts in favor of the defendants based on the evidence submitted with respect to the first two elements of a medical malpractice claim,[5] we now turn to the third element-a causal connection between the defendants' alleged negligence and Mr. Smallwood's "injuries resulting therefrom."[6]
Causal connection
This Court has consistently held that, in a medical malpractice case, a plaintiff must show that the injuries complained of were proximately caused by a breach of the standard of care (or, in other words, that a breach was the cause in fact of the injury alleged). See Gaffney v. Giles , 14-0384, p. 19 (La. App. 4 Cir. 4/29/15), 165 So.3d 1100, 1111 ; Tucker v. Sullivan , 04-1715, p. 5 (La. App. 4 Cir. 7/27/05), 913 So.2d 857, 860 ; Sandifer v. Wise , 00-0293, p. 6 (La. App. 4 Cir. 2/7/01), 780 So.2d 1099, 1102 ("the plaintiff must ... demonstrate by a preponderance of the evidence a causal nexus between the defendant's fault and the injury alleged"). Moreover, as the Supreme Court explained in Pfiffner , 94-0924 643 So.2d at 1233 :
In a medical malpractice action, the plaintiff must show that as a result of the defendant's negligence he suffered injuries that would not otherwise have occurred. Plaintiff need not show that defendant's conduct was the only cause of the harm nor must he negate all other possibilities. Rather, he must show by a preponderance of the evidence, or more probably than not, that he suffered the injury because of defendant's conduct.
In this matter, as we previously noted, Dr. Frangipane was critical of the defendants' treatment of Mr. Smallwood, and more particularly, with their alleged failure to provide what he believed were additional measures to prevent DVT. As to the issue of causation, Dr. Frangipane testified as follows:
Q. Having gone through the details of the treatment that Mr. Smallwood went through both at Baptist and the SNF, skilled nursing facility, are you still of the opinion that he should have been administered a pharmacologic DVT prophylaxis?
A. I still hold that opinion, sir; yes.
*68 Q. Are you of the opinion that it was a breach of the standard of care for the treating physicians not to have prescribed that?
A. I agree with that.
Q. And that that breach was responsible, in turn, for Mr. Smallwood's passing away from pulmonary embolism ?
A. I continue to voice that opinion.
We believe that this exchange, at a minimum, meets the plaintiff's burden in establishing a causal connection between the defendants' alleged negligence and Mr. Smallwood's demise. That is, this testimony supports a reasonable conclusion that more probably than not, Mr. Smallwood "suffered the injury because of defendant[s'] conduct."[7] Pfiffner , 94-0924, p. 8, 643 So.2d at 1233.
CONCLUSION
Based on the foregoing, we find that the trial court correctly granted the motion for a directed verdict in favor of Dr. Hawawini. As to the remaining defendants, however, we find that the trial court improperly granted their motions for directed verdict. We, therefore, affirm the trial court's judgment as to Dr. Hawawini, reverse the trial court's judgment as to the remaining defendants and remand this matter for further proceedings.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED

The Louisiana Supreme Court, in Pfiffner , explained this concept as follows:
Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence .... Failure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary are also examples of obvious negligence which require no expert testimony to demonstrate the physician's fault.
Id. , 94-0924, p. 9, 643 So.2d at 1233-34.

In his testimony, Dr. Frangipane testified that he is board certified in general surgery and also that he is "grandfathered in vascular surgery."

Because we have found that the trial court correctly granted a directed verdict in Dr. Hawawini's favor, our reference to "the defendants" for the remainder of this opinion is a reference to the remaining defendants, collectively.

Our finding is not to be construed as a determination of the plaintiffs' ultimate success following a complete trial of this matter. We only find that the evidence was sufficient to warrant a denial of the motions for directed verdict.

Minor , 16-0323, p. 9, 206 So.3d at 1076.

Again, we express no opinion as to whether, after a full trial on the merits, a jury would find in favor of the plaintiff. We simply find this testimony to be sufficient evidence to support the denial of the motions for directed verdict and the submission of the case to the jury.