641 So.2d 610 (1994)
Janice L. TURNER and James Turner
v.
Dr. Hamid MASSIAH[1] and Louisiana Medical Mutual Insurance Company and The Louisiana Patient's Compensation and Oversight Board and Dr. Martin B. Flam, Dr. Elliott B. Black, Dr. Simon B. Ward, The St. Paul Fire and Marine Insurance Company.
No. 94-CA-29.
Court of Appeal of Louisiana, Fifth Circuit.
July 1, 1994.
Rehearing Denied September 16, 1994.
*612 Stephen M. Pizzo, J. Elliot Baker, Metairie, for intervenor/appellant Louisiana Patient's Compensation and Oversight Bd.
Donna G. Klein, Monica A. Frois, Appellate Atty., New Orleans, for defendants/appellees, Hamid Massiha, M.D. and Louisiana Medical Mut. Ins. Co.
Caroline Norton, New Orleans, for plaintiffs/appellees Janice L. Turner and James Turner.
Before KLIEBERT, WICKER and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiffs, Janice and her husband, James Turner, brought this medical malpractice action against defendants, Dr. Hamid Massiha (Massiha), Dr. Simon Ward (Ward) and their respective insurers, Louisiana Medical Mutual Insurance Company (LAMMICO) and St. Paul Fire and Marine Insurance Company (St. Paul).[1] Judgment was rendered in favor of plaintiffs, against both doctors and against The Louisiana Patient's Compensation Fund (PCF). The PCF intervened in the case after judgment. Plaintiffs, both Massiha and the PCF appealed. Plaintiffs argue that the Medical Malpractice Act, La.R.S. 40:1299.41 et seq. (the Act), is unconstitutional insofar as it limits their recovery of damages awarded by the jury. Massiha argues that the jury erred in finding him liable for plaintiffs' damages; and the PCF argues that the trial court erred in interpreting the Act to allow the recovery of damages to the extent of $500,000 for each liable health care provider (two caps). For the reasons which follow, the judgment of the trial court is affirmed.
Plaintiffs' case rests on allegations that Massiha, a plastic surgeon, and Ward, an obstetrician/gynecologist failed to timely diagnose her breast cancer despite continuous visits to them and complaints of a hardening in the upper-outer quadrant of her right breast. The following chronology of plaintiff's medical treatment is helpful to an understanding of the case.
05-08-84 Office visit, Massiha
05-14-84 Breast Augmentation, Massiha (implants)
05-17-84 Office visit, Massiha
05-17-84 Office visit, Massiha
05-31-84 Office visit, Massiha
08-07-84 Office visit, Massiha
08-30-84 Office visit, Massiha
09-06-84 Office visit, Massiha
09-13-84 Office visit, Massiha
11-01-84 Office visit, Massiha
11-07-84 Office visit, Massiha (on daughter's appointment)
08-05-85 Office visit, Ward

*613 11-21-85 Office visit, Colon (on husband's appointment)
05-19-86 Office visit, Massiha
11-03-86 Office visit, Massiha (on daughter's appointment)
11-24-86 Office visit, Massiha
01-15-87 Office visit, Ward
05-08-87 Office visit, Dr. Black
05-12-87 Mammogram, Dr. Flamm
05-18-87 Office visit, Dr. Black
08-19-87 Work physical, Dr. Accure
12-30-87 Rt. breast implant exchange, biopsy, Dr. Black
12-31-87 Mastectomy
Plaintiff first consulted with Massiha on May 8, 1984. On May 14, 1984 she had breast augmentation surgery in which silicone-saline gel implants were inserted under her breast tissue and over the muscle in her chest. Almost from the very beginning, plaintiff had problems with hardening of her breasts. She complained to Massiha. He felt the area and determined, without testing, that the hardening was a common occurrence of augmentation surgery called capsular contracture, where the tissue around the implants forms pockets or capsules and scar tissue develops which feels hard. The scar tissue can develop to such an extent that it actually squeezes the implant giving the entire breast a very hard feeling. Plaintiff had more trouble with her right breast than her left and testified that at times her right breast felt like a tennis ball.
Plaintiff saw Massiha eight or nine times in the remaining six months of 1984, continuously complaining of the hardening she felt. Massiha believed that the hardness was solely related to scar tissue and on two occasions performed a non-invasive procedure called a closed capsulotomy where the scar tissue is physically squeezed and broken up. Massiha advised plaintiff that the only treatment to relieve the hardness was the capsulotomy or, if she preferred, she might get improvement by having the implants replaced. However, he advised her that it would be necessary to replace both implants and plaintiff only wanted the right one replaced. In August of 1985, over a year after the augmentation surgery, plaintiff saw her obstetrician/gynecologist, Dr. Ward, complaining to him about the hardness in her right breast. Ward performed a breast examine and felt a thickening in plaintiff's right breast, but believed it best for the plastic surgeon to deal with it. So, Ward did not send plaintiff for any tests but expressed that she should take it up with her plastic surgeon.
Because plaintiff was feeling somewhat dissatisfied with Massiha, and she did not want both implants replaced, she attempted to get a second opinion from another plastic surgeon, Dr. Gustavo Colon. Her husband was being treated by Dr. Colon. On November 21, 1985, plaintiff attended her husband's appointment with him and asked Dr. Colon about replacing the implant. She questioned whether he would replace just one and how much it would cost. Dr. Colon looked at plaintiff's breast to determine if the implant was over or under the chest muscle and consulted with her.
She again saw Massiha in May and November of 1986, with the same general complaints. Additionally, plaintiff testified that there was a distinct mass in the upper-outer quadrant of her right breast that was forming a distinct oval lump. Massiha again believed that the thickening or hardness was scar tissue. He again did not send plaintiff for any diagnostic tests, such as a mammogram. Plaintiff again saw Ward in January of 1987 with the same complaints about her breasts and he did not send her for any diagnostic tests either.
Finally in May of 1987, plaintiff went to a third plastic surgeon, Dr. Elliot Black, to consult him about replacing her right implant only. She did not want the left one replaced and Massiha insisted that both be done to insure symmetry. Dr. Black did a breast exam and diagrammed in plaintiff's chart an oval thickening or hard spot in the upper-outer quadrant of her right breast. He sent plaintiff to Dr. Martin Flamm, a radiologist, for a pre-operation mammogram.
On May 12, 1987 the mammogram was performed. It was not positive for cancer, but it was not conclusively negative either. There are primary and secondary signs of cancer that may be present in a mammogram. *614 There were no primary signs of cancer, like a distinct lump, present in plaintiff's mammogram. But there were secondary signs, an inverted nipple and asymmetric density of the right breast as well as whiteness in the x-ray, although there was no defined mass. The presence of secondary signs means cancer could not be ruled out, but secondary signs often have benign causes. Dr. Flamm knew of the upcoming surgery planned with Dr. Black, so he recommended biopsy of the questionable area at the time of the surgery or, if surgery was not performed, close follow-up. However, Dr. Flamm told plaintiff that he was 95% sure that her mammogram was negative. Plaintiff, believing she had no problems, postponed her operation until December of 1987.
On December 30, 1987, in the operation to exchange the right implant, Dr. Black took a biopsy of the questionable area and it came back positive for cancer. The following day, December 31, 1987, a right modified radical mastectomy was performed on plaintiff with removal of all the breast tissue, the lymph nodes and some underlying muscle. It was determined that the cancer had spread to seven of plaintiff's lymph nodes. At that time she had stage II cancer.
On July 7, 1989 a medical review panel was convened to consider plaintiffs' allegations of medical malpractice against Massiha, Ward, Black and Flamm. The panel consisted of Dr. Michael Teague, a plastic surgeon, Dr. John Heard, a radiologist and Dr. Paul Summers, an obstetrician/gynecologist. Concerning Massiha, the panel found that he "failed to comply with the appropriate standard of care as charged in the complaint" and that his failure was a cause of plaintiffs' resultant damages because "earlier diagnosis would have made a cure more likely." Concerning Ward, the panel found that there was a material question of fact that should be resolved at trial. Concerning Black and Flamm, the panel found that the evidence did not support the conclusion that these two doctors had failed to meet the standard of care as charged in plaintiffs' complaint.
Plaintiffs filed suit on August 28, 1989 against four doctors, Massiha, Ward, Black and Flamm, and their respective insurers. In her petition, it was asserted, among other things, that the Act was unconstitutional. Black and Flamm were voluntarily dismissed from the case on December 6, 1990, before trial. On July 9, 1991, the parties, by consent, agreed to bifurcate consideration of the question of the constitutionality of the Act from the trial for liability and damages. Thereafter, trial commenced on June 1, 1992 and lasted five days. At the conclusion of trial, the jury returned a verdict in favor of plaintiffs and against defendants, attributing 60% of the negligence to Massiha and 40% to Ward. The jury assessed damages of $250,000 for loss of breast, disfigurement, pain and suffering, $750,000 for loss of chance of survival and future mental distress, $250,000 for future medical bills, $48,000 for past medical bills, and, $20,000 for James Turner's loss of companionship and consortium.
On June 30, the trial court ruled on defendants' Motions for Summary Judgment concerning the constitutionality of the Act, holding that the Act was constitutional and would be applied to the jury verdict, limiting plaintiffs recovery to the amount of $500,000 per claim, or $500,000 against each liable health care provider, exclusive of medical and costs. Plaintiffs appealed from this ruling.
On that same date, based on the court's ruling on the application of the Act, the jury verdict was made the judgment of the court. Accordingly, Massiha (60% negligent), LAMMICO and the PCF were held liable for a total of $500,000. Massiha and LAMMICO were held liable for $100,000 and the PCF for the remaining $400,000. Ward (40% negligent), St. Paul's and the PCF were held liable for a total of $400,000. Ward and St. Paul's were held liable for $100,000, which they had already tendered, and the PCF was held liable for the remaining $300,000. The PCF was also ordered to pay $8,000 (which is 40%) of the loss of consortium award in favor of James Turner.
On August 6, 1993, the PCF intervened in the case and promptly filed a Motion for a Suspensive Appeal. Thereafter, by agreement between plaintiffs and the PCF, the court's judgment was amended in a minor particular concerning the payment of future medicals, and, as amended, judgment was *615 rendered by the court on September 7, 1993. Massiha's Motion for New Trial was denied and Massiha also filed a Motion for a Suspensive Appeal. Thus, we have three separate appeals before the court.
PLAINTIFFS' APPEAL
Plaintiffs filed a Motion and Order for Appeal from the court's ruling which granted defendants Summary Judgment and dismissed plaintiffs' claims of the unconstitutionality of the Act insofar as it limited their recovery. The Order for Appeal was signed by the trial judge. However, in brief to this court on appeal, plaintiffs' arguments are in support of an affirmance of the lower court judgment and arguments as to the unconstitutionality of the Act have not been asserted. As noted in the trial court's reasons for granting the summary judgment and holding that the Act was constitutional, the issue of whether a medical malpractice victim's recovery against the health care provider can constitutionally be limited has been addressed by the Louisiana Supreme Court in Butler v. Flint Goodrich Hosp., 607 So.2d 517 (La. 1992) and answered affirmatively. We are constrained to follow that decision. Accordingly, we find no error in the trial court ruling dismissing plaintiffs' claims of unconstitutionality of the Act.
MASSIHA'S APPEAL
In brief, Massiha assigns eight errors in the lower court proceedings. However, the main focus of his brief is on the argument that the jury was clearly wrong or manifestly in error in finding that he was negligent in his treatment of Janice Turner by not ordering a mammogram and that such negligence proximately caused damage to plaintiffs.
It is well settled that, on appellate review of a factual determination, the reviewing court may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Also, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, 283 So.2d 716 (La.1973). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State through DOTD, 617 So.2d 880 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra.
In the present case, we must consider whether the jury was reasonable in finding that Massiha breached the applicable standard of care in his treatment of Janice Turner and whether that negligence was a proximate cause of plaintiffs' damages. After reviewing the entire record, we conclude that the jury was presented with two permissible views concerning whether Massiha was negligent in his care of his patient and breached the standard of care appropriate under the circumstances and whether that breach caused plaintiffs damages. Thus the jury's findings were reasonable and not manifestly erroneous.
As outlined in detail above, the facts of this case indicate that Janice Turner reported to her physician, for over a two year period, that she felt unusual hardness in her right breast. She testified that she could feel a distinct different kind of spot as early as November 1, 1984. Her daughter, neighbor and husband testified, generally corroborating her testimony, all stating that they felt this unusual hard spot in her right breast within a couple of months of the September 6, 1984 closed capsulotomy procedure which Massiha performed. Notwithstanding over two years of complaints, Massiha felt the breast and assumed that the area was scar tissue without ever sending her for a diagnostic test, such as a mammogram. He testified that, in his opinion, the hardening in the breast felt like scar tissue, so there was no need for a mammogram.
A medical review panel, consisting of three physicians was convened and reviewed the case. According to Dr. Teague, a panel member who testified at trial, they felt that Massiha had failed to adhere to the appropriate *616 standard of care under the circumstances in that he did not refer her for a mammogram or further diagnostic evaluation. The panel generally seemed to be of the view that, where a breast abnormality exists and persists, one must take diagnostic steps to rule out cancer as a cause. Dr. Ettinger, an oncologist, testified in accord with the panel's assessment. He stated that the cancer society recommended mammograms in cases where the patient has an unusual hard spot in her breast and, if persistent, a biopsy should be performed. The panel was of the view that since Massiha did not take these steps to properly diagnose the unusual and persistent hard spot in her breast, he breached the appropriate standard of care. The jury, obviously, made the same finding in returning a verdict against Massiha.
Janice Turner was examined on May 8, 1987 by Black. He diagrammed in his chart an oval area of hardness in the upper outer quadrant of her right breast in the general area where the cancer was found. Thus, he felt the suspicious area and referred her for a mammogram. At this point in time, she had an inverted right nipple and asymmetric density of her right breast. Dr. Flamm's report, dated May 12, 1987, stated that the patient had reported to him that she had had gradual nipple inversion for the past 6 to 12 months. She had last been to Massiha's office not even six months prior to this and he did not send her for the mammogram then either. At that time the mammogram showed secondary signs of cancer and prompted a recommendation for a biopsy of the suspicious area. When the biopsy was performed in December of 1987, plaintiff was diagnosed with stage II cancer that had involved seven of her lymph nodes. Dr. Ettinger testified that, with seven lymph nodes testing positive, had her cancer been detected from twenty-four to thirty-six months earlier, she would have likely had no positive nodes. Dr. Ettinger was specifically asked if the cancer could have appeared since January of 1987 and he stated that it could not have. He also testified that it was a slow growing tumor and could have been growing since 1984. He further stated, that had the tumor been found in 1984 or 1985 instead of the end of 1987, it would have been in Stage I and her prognosis would have been much better with an 80%-90% chance of being disease-free instead of a 25% chance now.
Massiha testified, agreeing that if a physician feels a suspicious mass in a patients' breast, he should send her for a mammogram. However, he stated that he did not feel a suspicious mass in plaintiff's breast. Absent a suspicious mass, there was no reason to send her for a mammogram and, thus, no breach of the standard of care. Massiha had two expert witnesses testify in accord with his view, that absent a suspicious mass, there was no reason to send her for a mammogram. These two experts disagreed with the contrary panel findings. The defense also presented evidence that, although she was examined over the two and one half years by six different doctors, none of them felt a suspicious mass in her breast and the mammogram that was performed in May of 1987 was not positive of cancer.
Plaintiffs rebutted the defense evidence with the testimony from Drs. Teague and Summers that an unusual hardness in a woman's breast should be properly diagnosed to rule out cancer. Of the six doctors who examined her and found nothing, the jury found two, Massiha and Ward, negligent. Plaintiff testified that Dr. Colon did not touch her breasts. Dr. Black must have found something because his records show a diagram of an unusual spot in the upper outer quadrant of the right breast in the general area of the cancer. Dr. Flamm noticed the inverted nipple and the asymmetric density of the right breast although he did not feel a mass. And Dr. Accure preformed a routine pre-employment physical on her. Furthermore, plaintiffs presented the testimony of Dr. Heard, one of the medical review panelists, who stated that he felt the mammogram was positive of cancer. And, even if not positive of cancer, it was not negative of cancer and evoked a recommendation for a biopsy which eventually led to the cancer diagnosis.
Accordingly, while it is clear that both sides presented evidence to support their view of the case, the jury found plaintiffs' evidence either more credible or more convincing *617 as they returned a verdict in her favor, finding Massiha negligent and said negligence a proximate cause of plaintiffs' damages. We find that this jury determination was a reasonable one, based on the record as a whole, and we conclude that it was not clearly wrong or manifestly erroneous.
Next, Massiha argues that it was reversible error for the trial court to allow testimony of plaintiffs' daughter, Lynna Recato, regarding her surgery. He argues that this testimony, involving complaints, unduly prejudiced the jury. We disagree.
Recato's testimony was primarily presented in the context of the fact that her mother had gone with her on several of her appointed visits and had spoken to Massiha during those visits although it was not apparent on her chart. Moreover, part of Recato's testimony involved the fact that she was going to have Massiha do rhinoplasty or nose reconstruction, indicating complete satisfaction with his work. We see no error in the admission of this testimony.
Massiha argues that the court committed reversible error in allowing testimony concerning the type of implants he inserted in plaintiff's breasts and whether they were placed over the muscle or under the muscle. He argues that he was prejudiced by this evidence as it fed into the public's mass hysteria concerning breast implants.
The negligence alleged against Massiha had nothing to do with the type of implant he used or where he located it. Plaintiffs never asserted this as part of their actions against him. However, the accuracy of Massiha's medical records and his record-keeping techniques were called into question and were legitimate issues presented to the jury as there were discrepancies over the dates of her visits and what the doctor did on certain visits. In support of the inaccuracy of his records, evidence was presented that what was in his records, that is the type of implants and where they were placed, did not coincide with the actual facts. There was no error in the admission of this evidence in this context.
In his next assignment of error, Messiha argues that the trial court committed reversible error in allowing the testimony of a radiologist, an obstetrician/gynecologist and an oncologist as to the standard of care appropriate concerning him, a plastic surgeon.
First, it must be noted that the radiologist and the obstetrician/gynecologist were members of the medical review panel. The panel was statutorily convened and Massiha made no objection to its composition. Therefore, the members of the panel were properly allowed to testify at trial.
Generally, where the alleged acts of negligence raise issues peculiar to the particular specialty involved, then only those qualified in that specialty may offer evidence of the applicable standards. La.R.S. 9:2794(A)(1). However, it is a specialist's knowledge of the requisite subject matter, rather than the specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised; a particular specialist's knowledge of the subject matter on which he is to offer expert testimony is determined on a case by case basis. McLean v. Hunter, 495 So.2d 1298 (La.1986); Soteropulos v. Schmidt, 556 So.2d 276 (La.App. 4th Cir.1990).
In the instant case, Massiha's own witness, Dr. Hoffman, testified that there is a proper technique of breast examination and follow-up of breast complaints taught to all medical students regardless of their specialty. Accordingly, we do not find that the testimony of physicians, other than plastic surgeons, as to proper breast examination and follow-up techniques was improperly admitted.
Massiha argues that the court committed reversible error in allowing questions by plaintiffs' counsel concerning his ethnic background. He argues that this questioning injected race into the proceedings and unfairly prejudiced the jury against him.
First it must be pointed out that this questioning by plaintiffs' counsel was not objected to at trial and, without objection, is not properly reviewable on appeal. Moreover, in five days of trial we find plaintiffs' counsel questioned *618 Massiha on one page of the transcript concerning his medical education which did take place in Iran. The questioning occurred on cross examination, concerning the sufficiency and/or accuracy of his medical records and whether he was taught to include certain information in his records in his medical training in Iran. We find no reversible error in this limited questioning on cross examination concerning the defendant's medical training.
Next, Massiha argues that the trial court committed reversible error in allowing testimony about his professional liability insurance. In this assignment of error, he is referring to plaintiffs' counsel's questioning of himself, and his expert witnesses, concerning the fact that they are all insured by LAMMICO.
LAMMICO is a party defendant to this action. Moreover, it is a medical malpractice insurance company that is itself owned by physicians. Under La.C.E. art. 607, a witness' credibility may be attacked by questioning him concerning his relationship to a party or his bias or interest. Thus, the questioning of the witnesses concerning their insurer, LAMMICO, was permissible in showing their relationship to a party and any bias or interest they might have in the outcome of the case.
Next, Massiha argues that the trial court erred in charging the jury concerning the "loss of chance of survival." Particularly, it is argued that the charge did not accurately convey the plaintiffs' burden of proof.
The burden of proof imposed on a plaintiff in a medical malpractice action is set out in La.R.S. 9:2794. As pertains to the proof of damages, La.R.S. 9:2794 provides in pertinent part that the plaintiff has the burden of proving:
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have been incurred.
The charge objected to by defendant provided:
Mrs. Turner bears the burden of proving by a preponderance of the evidence that Dr. Massiha and or Dr. Ward were guilty of a breach of duty to her, in failing to take timely and appropriate measures to diagnose her breast cancer, such breach of duty constituting mal-practice.
Once this is established, the question becomes whether the mal-practice lessened Mrs. Turner's chance of survival. If any significant possibility of survival was destroyed, this reduction in life expectancy and its probable effect on the quality of Mrs. Turner's life may justify an award of damages.
Defendant relies on the case of Smith v. State of Louisiana through Dept of Health and Human Resources Administration, 523 So.2d 815 (La.1988) as providing the appropriate burden of proof as follows:
... [T]he plaintiff does have the burden of establishing by a preponderance of the evidence that the defendant's conduct denied the patient a chance of survival.
Adequate jury instructions fairly and reasonably point out the issues and provide correct principles of law for the jury to apply to those issues. The instructions must properly reflect the law applicable in light of the facts of the particular case. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5th Cir. 1983), writ denied, 434 So.2d 1097 (La.1983). The mere discovery of an error in the court's instructions does not automatically justify a de novo review by the appellate court without first measuring the gravity or degree of the error and considering the instructions as a whole and the circumstances of the case. The manifest error standard may not be ignored unless the jury charges are so incorrect or so inadequate that the jury was precluded from reaching a proper verdict based on the law and the facts. Boh Bros. Const. v. Luber-Finer, Inc., 612 So.2d 270 (La.App. 4th Cir.1992), writs denied, 614 So.2d 1256 (La.1993). We find no such error in the jury instructions in this case.
To the contrary, when read as a whole, we find that the jury instructions accurately reflect the correct principles of law to be applied to the issues and facts of this case. While the specific portion of the charge objected to may not have clearly reflected the *619 plaintiff's burden, the court also charged the jury as follows:
Like other parts of the plaintiff's case, these damages must be established by a preponderance of the evidence. This means, on the other hand, that you are not entitled to award speculative damages for injuries which you think the plaintiffs might have suffered or might suffer in the future;
Therefore, considering the charge as a whole, we find that the jury was accurately and properly charged with the law applicable to this case. Moreover, the evidence in the case did establish plaintiff's damages in this regard by a preponderance of the evidence. Dr. Ettinger unequivocally testified that, at the time the cancer was found, it was in Stage II. He stated that, had it been found earlier, it would have been in Stage I and her chances of recovery correspondingly dropped from an 80% to 90% chance of being disease free to the present 25% chance. This testimony was not contradicted. Accordingly, we find that this assignment of error has no merit.
Similarly, the defense argument that the trial court erred in charging the jury on La.C.C. art. 2315 negligence has no merit when the charge is considered as a whole. The court gave general background information on La.C.C. art. 2315 negligence. But then went on to explain the particular burden in the instant case as provided by La.R.S. 9:2794, which was read verbatim to the jury.
PCF APPEAL
The PCF argues that the trial court erred in awarding damages to plaintiffs to the extent of "two caps" under the Medical Malpractice Act. The PCF takes the position that the Act (La.R.S. 40:1299.41 et seq.) limits a plaintiffs' total recovery, regardless of the number of defendant, qualified health care providers, who are adjudged liable, to $500,000, exclusive of future medical and related benefits plus interest and costs.
Plaintiffs argue in support of the lower court judgment. They first point out that the question is res nova in that it has not before been squarely presented or addressed by a Louisiana appellate court. Plaintiffs further argue in support of their position that their case is distinguishable from cases cited by the PCF in that plaintiffs here have asserted and proven totally separate, distinct and unrelated acts of negligence or claims against separate, distinct and unrelated health care providers practicing in different specialties, in different places and at different times. Thus, plaintiffs argue that each separate, distinct and unrelated malpractice claim gives rise to injuries with separate limitations under the Act.
The applicable statute is La.R.S. 40:1299.42(B) which provides in pertinent part:
(1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S.:1299.43, shall not exceed $500,000 plus interest and cost.
The PCF argues that the language used in La.R.S. 40:1299.42(B)(1) referring to "all claims" means "all claims" "against all liable health care providers." Plaintiffs argue that "all claims" refers to all claims for each individual act of negligence. Plaintiffs further argue that the PCF's interpretation is beyond the language of the statute which is to be strictly construed. Plaintiffs point out that under the PCF interpretation, a person who once recovers $500,000 under the Act, would thereafter be forever barred from asserting any other medical malpractice claim, although distinctly different and unrelated, against any other health care provider. Clearly, this was not intended by the statute.
Upon review, we find merit in plaintiffs' arguments. The issue presented in this appeal, whether La.R.S. 40:1299.42(B)(1) precludes the recovery by a patient of more than $500,000 where that patient was injured by more than one health care provider in unrelated acts of negligence, has not been squarely addressed. Furthermore, the language of the provision is unclear and susceptible of more than one meaning. As noted by Justice Dennis in his partial concurrence and dissent to Stuka v. Fleming, 561 So.2d 1371 (La. 1990):
I am reluctant to conclude that the Fund may never be made to pay more than $400,000 for injuries contributed to by *620 more than one health care provider-tortfeasor. Whether a single limitation applies to damages caused by plural defendants may depend on such factors as whether the defendants engaged in concerted action, whether the damages are severable, or whether the damages may be apportioned between the tortfeasors.
"Where a statute is ambiguous and susceptible of two constructions, the courts will give that construction which best comports with the principles of reason, justice and convenience, for it is presumed that the legislature intended such exceptions to its language as would avoid its leading to injustice, oppression, or absurd consequences." Freechou v. Thomas W. Hooley, Inc., 383 So.2d 337 (La. 1980).
Moreover, interpretation of the medical malpractice act is guided by the principle that "a statute which is in derogation of common or natural rights is to be strictly construed and not extended beyond its obvious meaning." Rodriguez v. Louisiana Medical, Mut. Ins., 618 So.2d 390 (La. 1993). That is, when a statute grants immunities or advantages (a cap) to a special class (qualified health care providers) against the general public, the claims of the grantee should be strictly construed. Rodriguez, supra.
This provision of the medical malpractice act, limiting an injured patient's right to recover for injuries or death sustained because of the negligence of a health care provider must be strictly construed. In so construing it, under the facts and circumstances presented herein, we find that the trial court was correct in interpreting the statute strictly, as permitting the application of separate caps to each separate act of negligence by each liable health care provider.
In this case, there were two separate and unrelated acts of negligence committed, one by each health care provider. Janice Turner was in Massiha's care alone for over a year before she consulted Ward. These two physicians were not in practice together or in any way related, professionally or otherwise. They each, on their own, in separate acts, breached the standard of care appropriate to the given situation and are each liable to plaintiffs for their own negligence. The jury apportioned the negligence, finding Massiha 60% at fault and Ward 40% at fault. Accordingly, we find that the trial court acted properly in its interpretation of La.R.S. 40:1299.42(B)(1) as not requiring a single $500,00 limitation to the damages caused by these two defendants.
Moreover, as further argued by plaintiffs, this interpretation of the act may be required to bring it within constitutional constraints. The public malpractice act, that applying to state run health care facilities, particularly La.R.S. 40:1299.39, limits a patient's recovery as follows:
Notwithstanding any other provision of law to the contrary, no judgment shall be rendered and no settlement or compromise shall be entered into for the injury or death of any patient in any action or claim for an alleged act of malpractice in excess of fire hundred thousand dollars plus interest and costs, exclusive of future medical care and related benefits valued in excess of such five hundred thousand dollars. (emphasis provided.)
This wording is significantly different from the language quoted above in the private act (La.R.S. 40:1299(B)(1)) and appears to apply the limitation to each individual act of malpractice, as plaintiffs argue the private act should be interpreted. Under the holding in Williams v. Kushner, 549 So.2d 294 (La. 1989), a more restrictive interpretation of the private act than the public act would be discriminatory and render the provision unconstitutional. Therefore, as plaintiffs argue, the interpretation of the private act today, applying the limitation to each act of malpractice by each liable health care provider, brings it in line with the public act, preserving its constitutionality.
Accordingly, for the reasons stated above, the judgment of the trial court is affirmed. Costs of appeal are to be paid by Massiha, LAMMICO and the PCF.
AFFIRMED.
NOTES
[1] The name of Dr. Hamid Massiha was misspelled in the original petition and the case is accordingly captioned with the error. However, henceforth it will be spelled correctly.
[1] Two other doctors were named as defendants in the original petition, Dr. Elliot Black and Dr. Martin Flamm. These doctors were dismissed from the suit prior to trial.