688 So.2d 1107 (1996)
Becky HEBERT, Plaintiff-Appellee,
v.
PODIATRY INSURANCE CO. OF AMERICA, et al., Defendants-Appellants.
No. 96-567.
Court of Appeal of Louisiana, Third Circuit.
October 9, 1996.
Writ Denied January 6, 1997.
*1109 R. Stuart Wright, Natchitoches, for Becky Hebert.
Ben Marshall, Jr., Shreveport, for Podiatry Ins. Co. of America, et al.
Charles T. Williams, Jr., New Orleans, John Elliott Baker, Metairie, for Louisiana Patient's Comp. Fund, et al.
Before SAUNDERS, SULLIVAN and GREMILLION, JJ.
SULLIVAN, Judge.
This is a medical malpractice action. Plaintiff, Becky Hebert, alleged in her suit that defendant, Dr. Dale Fazio, a podiatrist, negligently removed an excessive amount of her fifth metatarsal bones during surgery to remove bunionettes from the outer portions of her feet. A medical review panel concluded that Dr. Fazio's treatment of Hebert did not fall below the podiatric standard of care and that her damages were not causally related to his treatment of her feet. Hebert then filed the present suit in district court against Dr. Fazio and his insurer, the Podiatry Insurance Company of America.
The jury determined that Dr. Fazio's treatment of Hebert did breach the applicable standard of care and that Hebert's damages resulted from this substandard care. The jury awarded Hebert $1,508,042.21, delineated as follows:

Past, present, and future $ 900,000.00
 pain and suffering
Past medical expenses 8,042.21
Disfigurement 600,000.00
 _____________
Total $1,508,042.21

In the judgment, the trial court imposed the $500,000.00 "cap" on this award pursuant to La.R.S. 40:1299.42(B). The judgment cast Dr. Fazio and the Podiatry Insurance Company of America with liability for the first $100,000.00 in damages and the Louisiana Patient's Compensation Fund and Oversight Board (PCF) with liability for the remaining $400,000.00.
After the trial court rendered judgment, the PCF intervened and filed a suspensive appeal. Dr. Fazio and his insurer also suspensively appealed. Appellants contend that the jury erred in finding that Dr. Fazio's treatment of Hebert fell below the podiatric standard of care and in awarding excessive damages. Additionally, appellants maintain that the trial court erred in giving misleading jury instructions and in denying the defendants' motion for directed verdict.
For the following reasons, we conclude that the jury did not err in finding that Dr. Fazio's treatment of Hebert fell below the applicable standard of care. However, we find that the jury abused its discretion, under the facts presented in this case, by awarding an excessive amount of general damages to Hebert. In all other respects, we affirm.

FACTS
In September 1986, Hebert initially visited Dr. Fazio for complications caused by "knots" or bunionettes which had developed on the outside portion of both of her feet. Dr. Fazio examined her feet, took x-rays, and recommended surgical removal of the bunionettes, which are commonly known as "tailor's bunions."
Dr. Fazio performed the surgery on September 19, 1986. His surgical notes indicate that the procedure, a "lateral and plantar condylectomy of the fifth metatarsal head," went well. Dr. Fazio performed a bilateral tailor's bunionectomy involving removal of the bunionette and a portion of the fifth metatarsal head. The fifth metatarsal is the foot bone which connects to the fifth toe bone or phalange, i.e., the little toe.
Dr. Fazio instructed Hebert to keep her feet elevated and to apply ice packs to them in thirty minute intervals. He also told her to only wear wooden, open toe box orthopedic shoes during her convalescence.
Dr. Fazio's follow-up care notes indicate that he removed Hebert's sutures on October 2, 1986. On this date, he noted erythema (redness) on the right foot, concluding that *1110 "[s]he has been on her feet quite a bit apparently." Hebert returned a week later, and Dr. Fazio noted she was "doing well."
On October 16, 1986, Dr. Fazio noted that Hebert was "wearing sandals all day." He further documented that he instructed her to wear either tennis shoes with orthotic inserts or wooden orthopedic shoes; he discouraged the wearing of sandals.
Dr. Fazio's notes indicate that Hebert's next visit occurred on May 14, 1987. He noted moderate bilateral swelling of the fifth metatarsal head. He also documented "[p]atient states she had `bumped' her toe on side of foot several times."
On May 28, 1987, Dr. Fazio examined Hebert for the last time. He noted that x-rays taken showed "unusual soft tissue swelling" of the left fifth metatarsal head. He also wrote that Hebert "has been wearing sandals." He opined that demineralization and joint subluxation (partial dislocation) occurred. He further recorded that this was caused by Hebert's use of improper footgear. Dr. Fazio recommended a "simple arthroplasty meta-head resection" to eliminate her recurring bunionette deformity. Importantly, Dr. Fazio noted that he offered to perform this second surgical procedure at "[n]o charge to patient."
Instead of undergoing this second corrective procedure, Hebert decided to seek a second opinion from Dr. Nick Accardo, an orthopedic surgeon. In reviewing presurgery x-rays, Dr. Accardo diagnosed an angulation problem which was not corrected by Dr. Fazio's surgery. At the time, Hebert's fifth toes had become dislocated, with the left worse than the right. In June 1987, Dr. Accardo performed an osteotomy on Hebert's left fifth toe. This procedure involved cutting the bone to realign it and fixing it in a midline position with a screw and pin. On September 2, 1988, Dr. Accardo performed the same procedure on Hebert's right fifth toe. He saw her for follow-up visits on September 30, October 7, and October 27, 1988, and March 31, 1989. By the final visit, Dr. Accardo noted that both of her fifth toes were "riding up" over her fourth toes and dislocating again.
Hebert instituted the medical review panel proceedings by filing a complaint with the Commissioner of Insurance. In a letter to the panel dated August 29, 1989, Dr. Fazio maintained that his surgical treatment of Hebert complied with the standard of care and that Hebert's post-surgery problems resulted from "a dramatic case of patient non-compliance." On March 5, 1990, the medical review panel rendered its opinion wherein it concluded that (1) the evidence did not support the conclusion that Dr. Fazio failed to meet the applicable standard of care, and (2) the conduct complained of was not a causative factor of Hebert's asserted damages.
At the trial of this matter on October 9, 1995, Hebert testified that she absolutely could not walk for two to three weeks following the surgery. She had to be carried to and from the bathroom by either her husband or her father. She denied being noncompliant in any way with regard to Dr. Fazio's orders. She flatly denied Dr. Fazio's written record that she was on her feet too much and did not comply with his footgear recommendations. Hebert specifically stated that she has not worn sandals in the nine years since the surgery. She also denied telling Dr. Fazio that she had bumped her toe several times because she actually did not do so.
According to Hebert, by May of 1987, the knots were growing and her pain, which had been constant since the surgery, had become excruciating. Although Dr. Accardo attempted to correct her resulting dislocated toes, Hebert stated that they have since dislocated again. She related that her activity level had decreased significantly; it is hard for her to stand and cook or clean house. Hebert explained that no day has passed since the 1986 surgery in which her feet have been pain-free. She can now be on her feet for, at most, three hours at a time. She cannot wear dress shoes, boots, or leather-strap sandals; she is limited to wearing soft leather slip-on shoes.
Her husband, Earl Hebert, Jr., corroborated plaintiff's version of events. He stated that, during the three weeks after surgery, he would carry Hebert to the bathroom and that, when he was at work, she would have to *1111 crawl to get there. He explained that Hebert was compliant with Dr. Fazio's post-surgical orders. He testified further that, in May 1987, Dr. Fazio told him personally that he would fix her problem at no charge.
Emmitt Scott, Jr., Hebert's father, and Venita Scott, her mother, also corroborated Hebert's testimony. Mrs. Scott stated further that she has observed that it is painful for her daughter to walk for extended periods of time.
Hebert also presented the video deposition testimony of Dr. Accardo. Dr. Accardo stated that he was not qualified to give an opinion as to the podiatric standard of care or whether Dr. Fazio met that standard of care regarding his treatment of Hebert. He acknowledged reviewing the 1986 pre- and post-surgery x-rays taken by Dr. Fazio, from which he diagnosed an angulation problem which was not addressed by Dr. Fazio's chosen surgery method. He stated that the metatarsal head was not grossly enlarged and that Dr. Fazio's removal of approximately fifty percent of the metatarsal head caused articular instability which led to the subsequent dislocations. This deficient metatarsal bone contour, according to Dr. Accardo, caused his subsequently-performed osteotomies to be unsuccessful, resulting in the recurring dislocations.
Dr. Accardo opined that, if only an angular problem exists, the surgeon should not remove any of the metatarsal distal head. He stated that Hebert's problem was angular in nature and that Dr. Fazio should not have removed or involved the joint in surgery. He criticized Dr. Fazio for not taking weight-bearing x-rays which would have demonstrated the true extent of the angulation problem.
Dr. Accardo concluded that, if the toes remain dislocated, the next possible step would be a fusion of the joint using a bone graft to make the metatarsal and phalange bones grow together. He stated that this would result in a stiff joint.
On cross-examination, Dr. Accardo explained that, in September 1987 (three months after the left-side osteotomy), Hebert was wearing regular shoes. She exhibited no limp and no pain complaints. In October 1988, a month after the right-side osteotomy, she seemed to be healing well. Throughout his treatment, Dr. Accardo encouraged Hebert to massage the affected areas to thwart the onset of reflex sympathetic dystrophy. Dr. Accardo placed no restrictions on Hebert's activity level. He had not seen Hebert since her last office visit in March 1989.
Hebert's counsel questioned Dr. Fazio on cross-examination during her case-in-chief. He stated that the metatarsal head resection he performed on Hebert was a standard and acceptable treatment. He explained that he was aware of the orthopedic surgeon-preferred method, an osteotomy, but stated that the podiatric method is better. He opined that a podiatrist is better able to take care of such a problem than is an orthopedic surgeon.
Dr. Fazio testified that the standard of care in this operation is to preserve as much of the articular surface as possible. He stated that he removed between fifteen and twenty percent of Hebert's fifth metatarsal head. He directly disagreed with Dr. Accardo's assessment that he removed fifty percent of the metatarsal head, which he agreed would be treatment below the standard of care. Dr. Fazio did, however, concede that, by June 1987 when Hebert first saw Dr. Accardo, approximately fifty percent of the metatarsal head was missing. He attributed this loss of thirty to thirty-five percent more bone surface to demineralization and reflex sympathetic dystrophy which occurred during the healing process.
Dr. Fazio denied falsely documenting Hebert's non-compliance in his progress notes. He did state that his use of the word "apparently" in the notes indicated his impression of the situation and that Hebert did not volunteer that she had been on her feet too much. He stated that on October 16, 1986, Hebert appeared for her follow-up visit wearing sandals. According to Dr. Fazio, her non-compliance was a major contributing factor in her undesired result. Despite this view, he acknowledged offering to do a second corrective surgery at no cost to Hebert.
In Dr. Fazio's opinion, an osteotomy as performed by Dr. Accardo was not a consideration because Hebert did not have a prominent *1112 angulation problem. To do an osteotomy, Dr. Fazio stated that the angle must first be twenty-five degrees or greater. Hebert's x-rays, which were non-weight bearing, indicated a mild angle of eight to ten degrees.
Dr. Fazio also testified on direct examination in his defense. He orally reviewed the substance of his progress notes and reiterated that the fifty percent loss of the metatarsal heads was caused by reflex sympathetic dystrophy and disuse demineralization. He also reemphasized that his progress notes contained an accurate depiction of Hebert's condition.
Dr. Frederick Rossi, Jr., a podiatrist, testified on behalf of Dr. Fazio. Dr. Rossi served on the medical review panel in this case. He stated that the standard of care required a visual inspection, diagnosis, and x-rays to confirm the diagnosis. Thereafter, the podiatrist is to surgically remove the bunionette and any enlargement tissue above and below the knot. According to Dr. Rossi, defendant's surgical notes indicated that he complied with the standard of care. He stated that an osteotomy is warranted when an angulation problem reaches twenty to twenty-five degrees. Dr. Rossi stated that no such procedure was warranted in Hebert's case. Dr. Rossi also testified that the wearing of improper shoes after surgery can possibly cause a recurrence of the bunionettes. On cross-examination, he agreed that the removal of fifty percent of the metatarsal head would be below the standard of care.
Dr. Greg Bryan, a podiatrist, also testified on behalf of Dr. Fazio. He stated that the usual cause of a bunionette is an enlarged metatarsal head. In such cases, the standard of care calls for a visual recognition of the area as red and irritated along with the presence of associated pain. X-rays are used to confirm the visual diagnosis. Dr. Bryan stated that, by removing fifteen percent of Hebert's metatarsal heads, Dr. Fazio complied with the standard of care. Dr. Bryan explained that the fifty percent reduction of the metatarsal head six months after surgery resulted from a demineralization of the bone with reflex sympathetic dystrophy. He stated that this condition occurs when more blood than usual flows into the bone and washes too much calcium out of the bone. He also stated that the wearing of leather-strap sandals postoperatively could cause a recurrence of the condition.
On cross-examination, Dr. Bryan stated that, in ten years of practice, he has sat on between five to ten medical review panels. Every review was decided in favor of the defendant podiatrist. In fact, he knew of no medical review panel that had decided a case in favor of a patient and against a podiatrist. On one occasion, Dr. Bryan testified on behalf of a patient upon whom a podiatrist had performed eighteen separate surgical incisions. In that case, the medical review panel decision was rendered in favor of the podiatrist.
Also on cross-examination, Hebert's counsel had Dr. Bryan read from a podiatric research study which espoused that the procedure used by Dr. Fazio could result in recurrence of the original bunion or an increase in deformity. The research report recommended instead that a distal oblique osteotomy with an intramedullary kwire fixation be performed, a procedure similar to that which was done by Dr. Accardo.
Dr. Bryan reiterated that Dr. Fazio met the standard of care. He said, however, that he had never had a patient with a result similar to Hebert's.

STANDARD OF CARE
Defendants initially contend that the jury erred in determining that Dr. Fazio violated the podiatric standard of care. Specifically, defendants argue that this finding was erroneous because Hebert failed to establish, in her case-in-chief, the standard of care necessary of podiatrists when performing the surgical removal of bunionettes. In other words, Dr. Fazio maintains that Hebert failed to carry her burden of proof by not having a podiatrist testify as to the standard of care. He asserts that the testimony of Dr. Accardo, who admitted he had no knowledge of the podiatric standard of care, was insufficient in this regard.
*1113 La.R.S. 9:2794(A) provides that, in a medical malpractice action, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Where the alleged negligent acts raise issues which are limited and peculiar to the medical speciality involved, only those who are qualified in that specialty may testify as to the applicable standards. Turner v. Massiah, 94-29 (La.App. 5 Cir. 7/1/94); 641 So.2d 610, reversed in part on other grounds, 94-2548 (La.6/16/95); 656 So.2d 636; Soteropulos v. Schmidt, 556 So.2d 276 (La.App. 4 Cir.1990). However, "it is a specialist's knowledge of the requisite subject matter, rather than the specialty within which the specialist practices, which determines whether a specialist may testify as to the degree of care which should be exercised;...." Turner, 641 So.2d at 617; Soteropulos, 556 So.2d at 278. Where medical specialties overlap, a specialist in one field can testify as to the standard of care applicable to a procedure which is common to both disciplines, where there is no proof that the standard of care is different in each discipline. The party offering the expert must prove the witness' training, expertise, and skill in the procedure. Ricker v. Hebert, 94-1743 (La.App. 1 Cir. 5/5/95); 655 So.2d 493. The determination of an expert's qualifications to testify as to the standard of care must be made on a case-by-case basis. McLean v. Hunter, 495 So.2d 1298 (La.1986).
The present case is unique and different from the facts of the cases cited above in that, while plaintiff did have an orthopedic surgeon testify, her witness, Dr. Accardo, offered no testimony as to the standard of care required of podiatrists. In fact, Dr. Accardo disclaimed any knowledge of the podiatric standard of care. Although he could have testified on the standard of care applicable to the bunionette removal procedure performed by Dr. Fazio, his failure to do so necessarily means that plaintiff did not, by testimony of her own expert, establish the standard of care.
In Pfiffner v. Correa, 94-924, 94-963, 94-992 (La.10/17/94); 643 So.2d 1228, the supreme court held that a plaintiff in a medical malpractice claim need not always present expert testimony to establish the standard of care. Specifically, the supreme court stated:
We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794's requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant's fault and the injury alleged.
Id. at 1234. In other words, the plaintiff in certain instances can rely on the defendant physician's testimony or that of defendant's experts to establish the standard of care *1114 when there exists objective evidence of negligence which a lay jury can perceive. We conclude that the present set of facts presents such a case.
Drs. Fazio, Rossi, and Bryan uniformly testified as to and established the standard of care in this case. Each defense expert likewise agreed that removal of fifty percent of the metatarsal head would equate with substandard care. Dr. Fazio and these two experts also uniformly agreed that Dr. Fazio only removed fifteen percent of the metatarsal head and the residual loss was due to demineralization and reflex sympathetic dystrophy. Dr. Accardo, on the other hand, testified that the loss of fifty percent of the metatarsal head was due to Dr. Fazio's removal thereof, which led to the subsequent joint instability and dislocation.
The jury was faced with resolving two clearly contradictory versions of the events, i.e., did Dr. Fazio remove fifteen percent or fifty percent of the plaintiff's metatarsal head. Both of these possibilities were supported by objective medical evidence. The jury was capable of determining whether negligence occurred in resolving this relatively simple inquiry. The jury chose to believe Dr. Accardo's version, that Dr. Fazio removed too much of the metatarsal head and that this caused the subsequent dislocations. The jury's factual findings are subject to the manifest error rule. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La. 1991). After completely reviewing the record, we conclude that the jury's findings pertaining to Hebert's burden of proof were not manifestly erroneous.

DIRECTED VERDICT
At the close of Hebert's case, defendants orally moved for a directed verdict pursuant to La.Code Civ.P. art. 1810 on the basis that Hebert failed to establish the requisite standard of care. The trial court denied the motion. Appellants maintain that this was erroneous.
In Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, p. 14 (La.App. 1 Cir. 3/11/94); 634 So.2d 466, 478, writ denied, 94-906 (La.6/17/94); 638 So.2d 1094, the first circuit reviewed the rules applicable to a motion for directed verdict:
A motion for a directed verdict is appropriately granted when, after considering all of the evidence in the light and with all reasonable inferences most favorable to the movant's opponent, it is clear that the facts and inferences point so overwhelmingly in favor of granting the verdict, that reasonable jurors could not arrive at a contrary verdict. Adams v. Travelers Insurance Company, 589 So.2d 605, 608 (La. App. 2nd Cir.1991); Armstrong v. Lorino, 580 So.2d 528, 533 (La.App. 4th Cir.), writ denied, 584 So.2d 1166 (La.1991); Barnes v. Thames, 578 So.2d 1155, 1162 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La. 1991). However, if there is substantial evidence opposed to the motion, that is, evidence of such a quality and weight that reasonable and fair-minded men exercising impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury. Adams v. Travelers Insurance Company, 589 So.2d at 608; Cliburn v. Colonial Penn Insurance Company, 583 So.2d 103, 105 (La.App. 3rd Cir.1991); Armstrong v. Lorino, 580 So.2d at 533.
A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. Barnes v. Thames, 578 So.2d at 1162. The standard of review for the appellate court is whether, viewing the evidence submitted, reasonable people could not reach a contrary verdict. Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827, 849 (La.App. 1st Cir.), writs denied, 605 So.2d 1117, 1119 (La.1992); Cliburn v. Colonial Penn Insurance Company, 583 So.2d at 105. Moreover, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the claims. Adams v. Travelers Insurance Company, 589 So.2d at 608.
In the present case, the trial court did not err in denying defendants' motion for directed verdict. At the time the motion was made, the jury had witnessed Dr. Fazio testify as to the standard of care and Dr. Accardo's video deposition, which presented ample *1115 evidence on both sides of the causation issue. We cannot say that, at that point during the trial, reasonable persons could not reach a verdict contrary to that sought in defendants' motion.

JURY INSTRUCTIONS
Appellants contend that the trial court erred in giving the jury Hebert's requested charges numbers three and six. They also assert error in the trial court's modification of defendant's requested charge number six. Appellants maintain that the combination of these alleged errors resulted in the jury being misled into believing that Dr. Accardo was competent to testify concerning the applicable standard of care.
Hebert's requested jury charges do not appear separately in the record from the trial court's soliloquy of instructions. Appellants state in brief that the substance of Hebert's charges were read to the jury as follows:
When an expert is not given the benefit of all information and consideration which might affect his opinion, his testimony may [be] given less weight or may be totally disregarded. The testimony of the treating physician who has had the benefit of repeated examinations and sustained observation of the patient under his direct care and treatment, is to be accorded greater weight and is of more probative value than that of a physician who has not undertaken to treat the patient, but merely to examine him a few times in preparing to give his expert testimony regarding the patient's condition or only to make a diagnosis.
Defendant's requested jury charge number six read as follows:
Standard of knowledge, skill and care for physician and surgeon is best demonstrated from testimony of other experts in the field. Broadway v. St. Paul Insurance Co., 582 So.2d 1368 (La.App. 2d Cir.1991).
The trial court accepted this charge in part, deciding to delete "in the field" from the sentence.
Segura v. State Farm Ins. Co., 94-1428, pp. 4-5 (La.App. 3 Cir. 5/31/95); 657 So.2d 1047, 1050, provides a thorough review of the law applicable to assignments of error concerning jury instructions:
A trial court should give all requested instructions that are material and relevant to the litigation. Lincecum v. Missouri Pacific R. Co., 452 So.2d 1182 (La.App. 1 Cir.), writ denied, 458 So.2d 476 (La.1984). Failure to instruct the jury regarding an essential legal principal may constitute reversible error, Evangeline Farmers Co-op. v. Fontenot, 565 So.2d 1040 (La.App. 3 Cir.1990), but courts are not obligated to give the specific jury instructions submitted by the parties, Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3 Cir.1991). A court has fulfilled its duty if its instructions fairly and reasonably point out the issues presented by the pleadings and evidence, and provide the principles of law necessary to resolve those issues. Crooks v. National Union Fire Ins. Co., 620 So.2d 421 (La.App. 3 Cir.), writs denied, 629 So.2d 391, 392 (La.1993).
Moreover, even if a trial court errs by refusing to give a requested instruction, an appellate court should overturn a jury verdict on this ground only when it is clear that the instructions, taken as a whole, are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the relevant law and facts. Laborde v. Velsicol Chem. Corp., 474 So.2d 1320 (La. App. 3 Cir.1985), writ denied, 480 So.2d 738 (La.1986). An appellate court must exercise great restraint before overturning a jury verdict on the basis of erroneous instructions. Creel v. S.A. Tarver & Son Tractor Co., 537 So.2d 752 (La.App. 1 Cir. 1988).
Although appellants are correct in that Hebert's requested instructions numbers three and six are more appropriate in a treating physician/independent medical examiner situation, which is not the case in this matter, we perceive of no error in the trial court's charging the jury with this law. Both Dr. Fazio and Dr. Accardo were Hebert's treating physicians as defined in the subject instruction. When evaluated in light of the entire jury charge, it is clear that these instructions were relatively neutral and did not so prejudice the defendants that the jury *1116 was prevented from reaching a just verdict based on the relevant law and facts.
Defendants' requested charge number six reflected the general rule that a medical specialty standard of care is "best determined from testimony of other experts in the field." Broadway, 582 So.2d at 1372. We note that in Pfiffner, 643 So.2d at 1233, the supreme court, in emphasizing the modifier "best" in the subject phrase, construed this rule to mean that such expert testimony is "not absolutely required. Although such testimony is persuasive, it is not always controlling." (Citations omitted.)
The exceptions to this general rule of specialty-specific testimony include (1) when the physician does an obviously careless or negligent act, and (2) when the expertise necessary to treat a certain condition or to perform a particular procedure is not limited to one specialty. By deleting the prepositional phrase "in the field," the trial court in effect made the exception the general rule. The trial court erred in doing so. However, the defense was not prejudiced by this error because Dr. Accardo did not testify as to the standard of care and explicitly denied knowing the particulars of the standard of care. The only witnesses who testified to the standard of care were Dr. Fazio and his two expert podiatrists. This error was not consequential when evaluated in terms of the entire instructions. The jury charge, taken as a whole, was correct and adequate.

DAMAGES
Appellants maintain that the jury abused its discretion in awarding $1,500,000.00 in general damages, which they characterized as excessive. Appellants seek a reduction in general damages to a "reasonable" amount. Interestingly, even Hebert concedes that the award is excessive and treats as a foregone conclusion the proposition that this court will reduce the general damages awarded by the jury. Hebert suggests that the jury's award be lowered to $500,000.00, the amount of the statutory "cap" on her award which was imposed by the trial court. She suggests that, in effect, the recoverable amount of the verdict under the judgment not be modified on appeal.
Our review of this award is governed by Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993), which provides:
In Reck v. Stevens, 373 So.2d 498 (La. 1979), this Court commented on appellate review of general damage awards and on the "much discretion" in fixing damages accorded to trial courts by La.Civ.Code art. 1934(3)(1870). The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).

*1117 The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
"[T]he rationale of Reck, Coco and Youn applies to appeals by defendants as well as to appeals by plaintiffs." Andrus v. State Farm Mut. Automobile Ins. Co., 95-801, p. 8 (La.3/22/96); 670 So.2d 1206, 1210.
After carefully reviewing the entire record, we conclude that the jury abused its discretion in awarding such an excessive amount in general damages. It is clear from Hebert's testimony that she has suffered significant pain and that the resulting disfigurement is unsightly and embarrassing to her. She faces the prospect of future pain, especially if she undergoes the fusion suggested by Dr. Accardo. It is also obvious that her activity level has been curtailed as a result of Dr. Fazio's negligent treatment of a previously non-painful condition. She also suffers the inconvenience of being limited in her ability to wear certain types of shoes which she formerly could wear. On the other hand, Hebert stated that her ability to stand has been "limited" to three hours at a time. This is not a substantial impairment in our estimation. Additionally, Hebert had not seen a doctor for this condition in the six-year period since her last visit to Dr. Accardo. She did not say that she could not cook and clean, just that it is now more difficult to do so than before.
It is clear that this is a rare instance in which the jury abused its "vast" discretion when assessing damages to this particular plaintiff for her particular injuries. Such a large award is disproportionate to the damages which Hebert has suffered. The award constitutes an unreasonable amount under the circumstances.
When a jury abuses its discretion by rendering a quantum decision that is excessive or inadequate, the jury's appreciation of the evidence concerning the extent of the plaintiff's injuries is still entitled to some deference. At that point, the appellate court, deferring to the jury's decision to some extent, raises the inadequate award to the lowest reasonable amount or reduces the excessive award to the highest reasonable amount. Andrus, 670 So.2d 1206.
We have reviewed recent prior awards for guidance in the assessment of damages in this case. There are few cases, if any, which involve substantially similar injuries which are chronic in nature.
In Black v. State, Department of Public Safety and Corrections, 94-1305 (La.App. 3 Cir. 5/17/95); 657 So.2d 270, writs denied, 95-1528, 95-1546 (La.9/29/95); 660 So.2d 876, plaintiff injured his right foot when a tree stump fell on it, severing his big toe at the joint. The toe was reattached; thereafter, the toe became gangrenous and was partially amputated forty days after the accident. He was assigned a seventy-five percent permanent partial impairment of the right big toe, which equated to a fourteen percent impairment of the right foot. He had no functional disability which resulted. At trial, Black stated that, after the partial amputation, the pain was severe and felt like his whole leg had been cut off. He also explained that he had no resulting problems and could do the things he did before the accident. This court affirmed the trial court's award of $35,000.00 in general damages, finding the award to be neither abusively high nor abusively low.
In Martin v. Francis, 600 So.2d 1382 (La. App. 1 Cir.), writ denied, 606 So.2d 541 *1118 (La.1992), a thirteen year old boy was injured when a granite tombstone fell on his right foot. The impact nearly severed his big toe, second toe, and the tip of his third toe. These three toes were amputated a few days later. The jury awarded plaintiff partial medical expenses, but did not award general damages. The court of appeal, relying on this "legal error," assessed general damages res nova at $35,000.00.
In Casanova v. Ballard, 533 So.2d 1005 (La.App. 1 Cir.1988), writs denied, 537 So.2d 1163, 1165, and 1166 (La.1989), two plaintiffs appealed from a judgment rendered in favor of defendants, a mobile home park operator and an electric company, in an electrocution case. The court of appeal reversed and found the plaintiffs seventy percent at fault, the mobile home park operator fifteen percent at fault, and the electric company fifteen percent at fault. One of the plaintiffs, Walker, suffered third degree burns on his feet and minor burns on his hands and chest. He underwent amputation of the right great toe and part of the left great toe. His recreational and occupational activities were curtailed. Walker could not squat, climb a ladder, lift more than thirty-five pounds, or stand for greater than four hours at a time. Walker was awarded $100,000.00 for general damages and loss of past and future income. The income award amount was not specified in the opinion.
To award Hebert such a large amount, the jury must have determined that she suffered greatly with pain. Considering Hebert's particular injuries and the resulting chronic nature of her toe dislocations and pain, and, keeping in mind that we still must grant the jury's finding some deference, we conclude that an award of $250,000.00 for pain and suffering and $150,000.00 for disfigurement are the highest reasonable amounts which were within the trier of fact's discretion.

DECREE
For these reasons, we amend the judgment to reflect a reduction in general damages awarded by the jury from $1,500,000.00 to $400,000.00. In all other respects, the judgment is affirmed. Costs of this appeal are assessed in the following proportion: fifty percent to defendants-appellants, Dr. Dale Fazio and the Podiatry Insurance Company of America, and intervenor-appellant, the Louisiana Patients Compensation Fund and Oversight Board; and fifty percent to plaintiff-appellee, Becky Hebert.
AFFIRMED IN PART; AMENDED IN PART; AND RENDERED.